HÉCTOR BERBERENA y OTROS, demandantes y apelados, *v.* ILEANA ECHEGOYEN, ADMINISTRADORA DE DERECHO AL TRABAJO, ETC., demandados y apelantes; ASOCIACIÓN DE MAESTROS DE PUERTO RICO y FEDERACIÓN DE MAESTROS DE PUERTO RICO, interventores y recurrentes.

*Números:* AC-88–694    *Resueltos:* 21 de diciembre de 1988
RE-88–498
RE-88–517

*Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General,* y *Sylvia Cancio Bigas, Procuradora General Auxiliar,* abogados de El Pueblo; *Rafael A. Nadal Arcelay* y *Javier Cuevas Silva,* de *Cancio, Nadal & Rivera,* abogados de la recurrente Asociación de Maestros de Puerto Rico; *Miguel A. Jiménez Muñoz,* abogado de los apelados; *Raúl Santiago Meléndez,* del *Bufete Pérez Muñiz &*

*Santiago Meléndez*, abogado de la recurrente Federación de Maestros de Puerto Rico; *Luis R. Viera Zayas* y *Antonio Adrover Robles*, abogados del Departamento de Instrucción Pública.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

El Procurador General de Puerto Rico apela el decreto de inconstitucionalidad de la Sec. 6 de la Ley Núm. 25 de 3 de junio de 1960 (18 L.P.R.A. sec. 249d), que dispone que todo maestro que decida participar como candidato en la contienda electoral del país y que haya presentado su candidatura, será automáticamente relevado de sus funciones docentes y tendrá derecho a solicitar una licencia especial. En escritos separados, la Asociación de Maestros de Puerto Rico y la Federación de Maestros de Puerto Rico recurren del dictamen del Tribunal Superior. Por entender que se nos plantea una cuestión constitucional sustancial de gran importancia para el magisterio público y para el proceso electoral del país, aceptamos la apelación instada por el Estado. Por la importancia que reviste la cuestión planteada en sus méritos y para proteger a los maestros afectados por el dictamen del foro de instancia, también ordenamos la paralización de la ejecución del *injunction*.

■ La paralización es apropiada porque entendemos que, bajo el criterio constitucional prevaleciente de revisión judicial de reglamentación gubernamental, los apelantes han sometido "un caso fuerte de probabilidad de prevalecer en los méritos . . .". *Peña v. Federación de Esgrima de P.R.*, 108 D.P.R. 147, 154 (1978). *Sin embargo, esto no implica que en esta etapa de los procedimientos estemos prejuzgando los méritos de la cuestión constitucional planteada.*

En el presente caso, los apelados no sufrirán daño irreparable alguno si se detiene la ejecución del *injunction*. Ellos acudieron originalmente al tribunal para que se les exten-

diera a ellos y a todos los empleados públicos los beneficios de la licencia especial de los maestros. La invalidez de la licencia especial los deja en la misma posición en que estaban originalmente. En otras palabras, la paralización del decreto no los priva de ningún remedio o privilegio obtenido como resultado del dictamen judicial.

Por otro lado, los realmente perjudicados e interesados en la determinación del foro de instancia, los maestros que disfrutaban de la licencia especial, no fueron partes en el pleito y, por lo tanto, no tuvieron oportunidad de defenderse y exponer sus planteamientos. Ellos sufrirán un daño irreparable si el Estado se ve impedido de conceder las licencias especiales que dispone la ley al poner en peligro sus derechos de retiro, planes médicos, bono de Navidad, tiempo acumulado para ascensos y permanencia, y otros beneficios marginales adquiridos a través de los años.

Todavía en peor situación se encuentran aquellos que fueron electos a puestos públicos y que el Tribunal Superior les privó de su derecho a una licencia sin sueldo durante la incumbencia en el cargo electivo. La decisión del foro de instancia tiene el efecto de obligarlos a escoger entre renunciar al magisterio o no tomar posesión de sus nuevos cargos. Para estos maestros en particular, la decisión del foro de instancia los coloca en una angustiosa e insostenible encrucijada sin haber tenido la oportunidad de ser oídos. Para el Estado podría significar la pérdida de valiosos recursos humanos debido a las renuncias causadas por la implantación del decreto judicial.

Por otro lado, la paralización no resultará en una erogación de fondos públicos adicionales en el futuro inmediato. Ya el Estado pagó por las licencias con sueldo y hasta las próximas elecciones los empleados públicos apelados no necesitarán que se les conceda este beneficio para equipararlos con los maestros.

Al considerar el recurso presentado por el Estado y en ausencia de un pronunciamiento anterior de este Tribunal que claramente disponga de la cuestión planteada en este caso, la ley especial es acreedora de la presunción tradicional de constitucionalidad que gozan los estatutos. En *Pacheco v. Srio. Instrucción Pública*, 108 D.P.R. 592, 601 (1979), expresamente aclaramos que "[p]or no estar planteado ante nos el aspecto de validez constitucional de la Sec. 6 de las tantas veces mencionada Ley Núm. 25 de 3 de junio de 1960, *no estamos justificados en pronunciarnos sobre el particular*". (Énfasis nuestro.)

A pesar de que en *Pacheco v. Srio. Instrucción Pública*, supra, el compañero Juez Asociado Señor Negrón García emitió una opinión disidente en la cual se expresó sobre la constitucionalidad del estatuto, su posición no fue endosada por el resto del Tribunal. Es en esta apelación donde se plantea por primera vez la validez de esta legislación promulgada para evitar el discrimen contra los maestros, según fuera señalado por el Informe del Comité del Gobernador para el Estudio de los Derechos Civiles, en específico en el capítulo sobre la libertad académica. 1959-CDC-001 (agosto de 1959), 1 Der. Civ. 1, 42 (1973). El asunto requiere que con amplia perspectiva examinemos las posiciones de todas las partes interesadas antes de emitir un juicio definitivo.

█  Aunque reconocemos que hay situaciones que requieren una decisión nuestra de carácter sumario, por las razones expuestas anteriormente, en este caso no existen las circunstancias necesarias para adjudicar urgentemente la cuestión planteada al prescindir de ulteriores procedimientos apelativos y sin el beneficio de las comparecencias de todas las partes interesadas.

Entendemos que en este caso *no es oportuno y juicioso emitir criterios finales sobre la constitucionalidad del estatuto en esta etapa inicial del trámite de revisión.* Como re-

gla general, cuando en un recurso de apelación se plantea una cuestión constitucional sustancial que no ha sido resuelta anteriormente, véase *Calderón, Rosa-Silva & Vargas v. García,* 120 D.P.R. 803 (1988), y todas las partes afectadas no han tenido la oportunidad de comparecer, este Tribunal lo aceptará, le concederá a las partes una oportunidad adecuada de expresarse y oportunamente lo resolverá en sus méritos.

Hemos acogido el recurso de apelación y, por mandato constitucional, nos corresponde pronunciarnos por primera vez sobre esta cuestión. Al balancear la ausencia de perjuicio a los apelados con el daño que sufrirán los maestros que disfrutan de la licencia especial aquí concernida, concluimos que hacemos justicia si paralizamos los efectos de la sentencia y acogemos el recurso de forma tal que se le brinde a *todos* la oportunidad de expresarse. *Una decisión sumaria sin la adecuada ponderación judicial de todos los intereses involucrados en este litigio no es lo más aconsejable.*

Finalmente, este curso decisorio también nos permite examinar con más detenimiento los planteamientos de la Asociación de Maestros de Puerto Rico y de la Federación de Maestros de Puerto Rico relativos a que el foro de instancia les limitó, erróneamente, su participación en violación al debido proceso de ley. Ambas entidades representan casi la totalidad de la clase magisterial de nuestro país y deben, también, tener una oportunidad adecuada de exponer su posición sobre este asunto que tanto afecta a sus miembros. La prudencia judicial y la tradición de esta Curia así lo aconsejan.

Por los fundamentos expuestos anteriormente, y al amparo del mandato constitucional y del poder inherente de este Tribunal y de la Regla 44 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A, *se acepta la apelación instada y se ordena la paralización de los procedimientos en el foro de instancia.*

El Juez Asociado Señor Negrón García emitió una opinión disidente. El Juez Asociado Señor Rebollo López emitió un voto particular. El Juez Asociado Señor Ortiz no intervino.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

Hay una gran política universal que, quiérase o no, es preciso seguir y recoger con instinto de oportunidad: *la de las ideas nuevas.*

Las grandes crisis producen los grandes cementerios de ideas.

*Es difícil desprenderse de aquellos criterios que estaban incorporados a nuestros hábitos, en los que encontrábamos belleza y seducción. Empero es inútil seguir oficiando en los altares de una fe ya extinguida.* (Énfasis suplido.) M. Iglesias Corral, *El Enigma del Derecho, Libro-Homenaje a Ramón María Roca Sastre*, Madrid, Ed. Gráficas Cóndor, 1976, Vol. I, pág. 63.

I

Dos (2) principios de génesis constitucional inspiran este disenso. El *primero*, el uso ilegal de fondos públicos en contravención a las prohibiciones constitucionales del Art. VI, Secs. 9 y 10, Const. E.L.A., L.P.R.A., Tomo 1. Debe descontinuarse el hábito de dilapidar fondos públicos inconstitucionalmente a costa del sacrificio de otros valores humanos y necesidades comunitarias. *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988); *P.N.P. v. Hernández, Srio. D.T.O.P.*, 122 D.P.R. 362 (1988). Cobran vigencia nuevamente las palabras siguientes: "En momentos en que en el país se debate públicamente la crisis y el estado de deterioro físico y académico de las instituciones educativas, y la escasez de medios económicos para afrontar tales problemas y mejorar los sueldos del magisterio, resulta una falta de civilidad la vigencia de la ley que nos ocupa." *Pacheco v. Srio. Instrucción Pública*, 108 D.P.R.

592, 603 esc. 3 (1979), opinión disidente del Juez Asociado Señor Negrón García. Y *segundo*, un rechazo judicial a la técnica legislativa de usar dos (2) varas distintas para medir situaciones similares o parecidas, según consagrado en la amplia sombrilla de "la igual protección de las leyes". Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 275. Como veremos, estamos ante una clasificación gubernamental que sin justificación válida intenta distinguir, para fines de un subsidio electoral, la concesión de unas vacaciones pagadas a unas personas —los maestros de instrucción pública— en contravención a los postulados que consagra la garantía de la igual protección frente al resto de los empleados públicos similarmente situados. Ello infringe la Constitución, pues arbitrariamente se les ha concedido un privilegio. L.H. Tribe, *American Constitutional Law*, Ed. Foundation Press, 1988, págs. 1437–1439.

## II

De entrada, una aclaración. La apelación del Estado y los recursos de revisión presentados separadamente por la Asociación de Maestros de Puerto Rico y la Federación de Maestros de Puerto Rico *no plantean ninguna cuestión compleja*. Esencialmente se trata de una controversia sencilla de derecho predicada en una misma premisa errónea: que la Ley Núm. 25 de 3 de junio de 1960, según enmendada, 18 L.P.R.A. sec. 249d, es de carácter económico-social. *Nada más lejos de la verdad. ¡Quitémosle esa acomodaticia etiqueta!* Al filo de la década, en *Pacheco v. Srio. Instrucción Pública*, supra, pág. 597, reconocimos sin ambages su naturaleza clara de *subsidio electoral* con fondos públicos que "crea un privilegio para una clase en particular que debe a su vez ser examinado y aplicado a base de un *estricto* escrutinio judicial". (Énfasis suplido.) Hoy, contra toda lógica y jurisprudencia anterior, el Estado pretende negar la filiación constitucional del principio igualitario que rige los desem-

bolsos públicos para fines político-partidistas y, con ello, descartar el análisis estricto de revisión judicial.

Procede, pues, *denegarse de plano la paralización de los procedimientos y confirmarse la sentencia dictada el 13 de octubre de 1988 por el Tribunal Superior, Sala de San Juan (Hon. Arnaldo López Rodríguez, Juez), que declaró inconstitucional la Sec. 6 de la Ley Núm. 25*, supra, que confiere el privilegio de una licencia *con sueldo* al maestro candidato a un puesto político y el derecho a optar —una vez concluido el proceso electoral— por regresar al magisterio o solicitar una licencia sin sueldo hasta la terminación del primer semestre escolar.

Con ese decreto sumario dio paso a la meritoria impugnación por varios empleados públicos de carrera,[1] candidatos a puestos electivos por el Partido Nuevo Progresista (P.N.P.) en los pasados comicios electorales de 8 de noviembre de 1988. Todos solicitaron, infructuosamente, una licencia de vacaciones *sin sueldo* con la intención legítima de realizar campaña política a favor del P.N.P. y sus candidaturas políticas.

En la demanda alegaron que, en su aplicación, la Ley Núm. 25, *supra*, era discriminatoria y que la "concesión de licencias con paga a los maestros del Departamento de Instrucción Pública[,] certificados por la Comisión Estatal de Elecciones como candidatos a puestos electivos, viola la Cláusula de la Igual Protección de las Leyes de la Constitución del Estado Libre Asociado de Puerto Rico". Esa discriminación consistía en favorecer exclusivamente a los maestros mientras otros empleados públicos aspirantes a un

---

[1] Héctor Berberena, Coordinador Regional en la Administración del Derecho al Trabajo (A.D.T.), candidato a alcalde en Humacao; José A. Meléndez, empleado del Departamento de Transportación y Obras Públicas (T.O.P.), candidato a alcalde en Naguabo; José R. Díaz Coss, también del T.O.P., y candidato a senador por el Distrito de Humacao, y Aníbal Meléndez Rivera, del Departamento de Servicios Sociales, candidato a alcalde en Fajardo.

cargo político tendrían que solicitar una licencia *sin* sueldo y, si se les negaba, vendrían obligados a trabajar en su campaña política fuera de horas laborables. Pidieron que se les reconociese su derecho a una licencia con o sin sueldo, y que se declarasen sus derechos individuales a disfrutarla "en igualdad de condiciones que los demás empleados públicos".

Oportunamente, la Administración del Derecho al Trabajo (A.D.T.) pidió la desestimación sumaria. Los restantes codemandados Departamento de Transportación y Obras Públicas (T.O.P.), Departamento de Servicios Sociales y el Director de la Oficina de Personal —*todos representados por el Secretario de Justicia*— aceptaron las alegaciones esenciales, pero adujeron que sus actuaciones fueron correctas acordes con un ejercicio de una discreción administrativa. De manera afirmativa, levantaron como defensa que "permitir que los empleados públicos se acojan a licencia de vacaciones con o sin paga para adelantar candidaturas políticas, sería derrotar totalmente el sistema de buen Gobierno y de pureza administrativa[,] y se quedarían desiertas las agencias y se crearía el mayor de los descalabros".

Subsiguientemente, el tribunal de instancia —"por razón de que una de las posibles vías remediales en la resolución del caso de epígrafe podría ser la de declarar nula la *Sec*[.] *6* de la Ley Núm. 25, [*supra*] . . . en cuyo caso esto afectaría una clase de funcionarios públicos que no son partes en este litigio, o sea los maestros del Departamento de Instrucción Pública del Estado Libre Asociado de Puerto Rico"— les notificó la pendencia del litigio y la oportunidad de exponer su posición. A su amparo, comparecieron el Departamento de Instrucción Pública (D.I.P.) y la Asociación de Maestros de Puerto Rico. Ambos se opusieron a que se declarara nula la referida ley.

En su dictamen,(2) el Tribunal Superior declaró inconstitucional el beneficio de la licencia especial con paga al maestro, así como la licencia sin sueldo hasta la terminación del primer semestre escolar, y por el período de la incumbencia en el cargo de resultar electo. Expidió un *injunction* permanente contra la Secretaria de Instrucción Pública, Sra. Awilda Aponte Roque y sus sucesores, y les ordenó —a partir de *9 de noviembre del año en curso*— que se abstuvieran de conceder y autorizar dichas licencias a los maestros de ese departamento. Dispuso la cancelación de toda licencia sin sueldo autorizada a los maestros desde el *1ro de enero de 1989*. Finalmente, prohibió al Secretario de Hacienda autorizar desembolsos de dinero para el pago de la referida licencia especial a partir de 9 de noviembre de 1988.

## III

Vehementemente, el Estado nos pide la paralización de la ejecución del *injunction*. Sus argumentos han sido incorpo-

---

(2) No debemos levantar escollos procesales y sustantivos donde no los hay. Sobre la capacidad jurídica de los demandantes Berberena *et al.* para impugnar la ley, basta señalar la regla asentada en nuestro ordenamiento jurídico expositiva de un enfoque liberal en las determinaciones en torno a si una parte tiene legitimación activa (*standing*). *Pacheco Fraticelli v. Cintrón Antonsanti*, 122 D.P.R. 229 (1988); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982); *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974).

Adviértase, además, el interés público en juego y la presencia de varias instrumentalidades gubernamentales. *Pacheco Fraticelli v. Cintrón Antonsanti*, supra; *Solís v. Municipio de Caguas*, 120 D.P.R. 53 (1987); *Asociación de Maestros v. Pérez, Gobernador Int.*, 67 D.P.R. 848 (1947).

Finalmente, en cuanto a los planteamientos de las recurrentes Asociación de Maestros de Puerto Rico y Federación de Maestros de Puerto Rico en torno a que el tribunal de instancia violó el debido proceso de ley al privarles —como representantes del magisterio— la oportunidad de expresarse, basta recordar nuestra unánime decisión en *Noriega v. Gobernador*, 122 D.P.R. 650 (1988), en que reiteramos —en decretos de inconstitucionalidad— la norma adoptada en *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 93 (1980), "[r]especto a la alegación de si este pleito es ò no un pleito de clase, valga decir que es innecesario que nos pronunciemos sobre el particular. *El pleito es sostenible como una petición de sentencia declaratoria e interdicto por personas claramente afectadas por la ley aquí cuestionada*". (Énfasis suplido.)

rados en la opinión mayoritaria del Tribunal. Es menester, pues, una breve referencia. A poco reflexionemos, veremos que esa ponencia y sus argumentos, más que en apoyo de la paralización, tienden a abonar a un decreto de constitucionalidad de esta legislación de privilegio. Es anticipable, pues, ese curso de acción. Más aún, están predicados únicamente en las consecuencias negativas y perjudiciales que se les causará a la clase magisterial privilegiada. *Ciertamente ello, en buena técnica adjudicativa, es cuestionable.* Objetamos ese tipo de análisis que sólo toma en cuenta los perjuicios a esta clase privilegiada, y no los de aquellos otros funcionarios y empleados marginados por el estatuto. *Dicho de otro modo, de los dos lados de la moneda se le adjudica exclusivamente la cruz al magisterio, olvidándose de la cara triste de la inmensa mayoría de servidores públicos.*

Para una mejor comprensión de las razones justificativas de una inmediata adjudicación de estos recursos y la improcedencia de la paralización, es menester aclarar la cubierta de esta legislación de privilegios. En su dimensión temporal, opera en tres (3) etapas: la *inicial,* que cubre el período comprendido entre la certificación del candidato y el día de las elecciones; la *intermedia,* que comienza inmediatamente después de las elecciones y se extiende hasta la conclusión del primer semestre escolar, y la *última,* que sólo se activa para candidatos electos y dura todo el cuatrienio en que éstos desempeñan sus respectivos cargos.

Con estas consideraciones en mente, es evidente que estamos en el momento más oportuno para pasar juicio sobre su inconstitucionalidad. De este modo, al final de la segunda etapa y en el umbral de la tercera, los maestros a quienes nuestra determinación pudiera afectar tendrían la oportunidad de tomar sus decisiones en un ambiente de mayor certidumbre. De recaer la determinación de inconstitucionalidad una vez comenzado el nuevo cuatrienio, los maestros electos

habrán tomado posesión de sus cargos. Debemos evitar crear esa situación.

Aclarado este extremo, exploremos la validez de las razones que se adelantan para paralizar.

Se aduce que "los apelantes han sometido 'un caso fuerte de probabilidad de prevalecer en los méritos . . .'. *Peña v. Federación de Esgrima de P.R.*, 108 D.P.R. 147, 154 (1978)". Opinión mayoritaria, pág. 77. Nos preguntamos, ¿cuáles?·

Seguidamente, se argumenta que los apelados "no sufrirán daño irreparable alguno si se detiene la ejecución . . . [pues] acudieron originalmente al tribunal para que se les extendiera a ellos y a todos los empleados públicos los beneficios de la licencia especial de los maestros[, y l]a invalidez de la licencia especial los deja en la misma posición en que estaban originalmente. . . . [L]a paralización del decreto no los priva de ningún remedio o privilegio obtenido como resultado del dictamen judicial [de inconstitucionalidad]". Opinión mayoritaria, págs. 77–78. El argumento, de tono paradójico, es incorrecto. No toma en cuenta que si bien el tribunal de instancia no les reconoció el pedido específico de una licencia con sueldo, adjudicó a su favor el planteamiento *medular* —real y sustantivo— de que esta legislación infringía el precepto constitucional de la igual protección de las leyes, pues establecía una clasificación estatutaria impermisible — subinclusiva y discriminatoria— sin que surgiera de su historial legislativo un interés apremiante "en financiar las campañas políticas de los maestros que se lanzan a competir en la arena política". Al suspender este Foro los efectos del *injunction, se devalúa ese importante principio constitucional y se amplía más la brecha existente de desigualdad e injusticia en el trato entre Berberena et al. y los maestros candidatos que disfrutan y continúan disfrutando, en todas sus etapas, los distintos beneficios de esta licencia de privilegios.* La iniquidad persiste a lo largo del cuatrienio. No

estamos ante un fenómeno pasajero atribuible solamente a la campaña eleccionaria.

Además, como demostraremos, evade enfrentarse a la realidad de que la licencia con sueldo atenta contra la prohibición de uso ilegal de fondos públicos y duplica los gastos presupuestarios por razón de los salarios que habrán de satisfacerse a los maestros sustitutos. ¿Es que estos fondos públicos no provienen de los contribuyentes representativos de todo el *spectrum* político insular, incluso los desafiliados? ¿No nos impone esta situación la responsabilidad de decidir ahora y evitar que continúen estos desembolsos? ¿No configura ello una patología de pago ilegal sin prestación de servicios que exige nuestra más pronta intervención?

A renglón seguido, se sostiene que los "realmente perjudicados e interesados . . . [son] los maestros que disfrutaban de la licencia especial, [que] no fueron parte en el pleito y, por lo tanto, no tuvieron oportunidad de defenderse y exponer sus planteamientos. Ellos sufrirán un daño irreparable si el Estado se ve impedido de conceder las licencias especiales que dispone la ley al poner en peligro sus derechos de retiro, planes médicos, bono de Navidad, tiempo acumulado para ascensos y permanencia, y otros beneficios marginales adquiridos a través de los años". Opinión mayoritaria, pág. 78. Este argumento no reconoce que precisamente fueron los demandantes quienes durante todo el período preeleccionario no gozaron del privilegio de estas licencias y, por ende, los que en realidad sufrieron al máximo todos los perjuicios.

Tampoco puede afirmarse que el decreto de inconstitucionalidad priva a los maestros de los derechos que disfrutan bajo esta legislación. *El mismo fue emitido con carácter prospectivo.* A tal efecto, el tribunal de instancia fue muy claro. Ordenó —efectivo el *9 de noviembre del año en curso*— que no se concedieran y autorizaran más licencias, con o sin sueldo. Además, que se cancelara "toda licencia sin

sueldo autorizada a los maestros en virtud del referido estatuto legal a partir del día *1ro. de enero de 1989*".

Ese mandato simplemente significa que, una vez advenga final y firme la sentencia, estos maestros podrán continuar disfrutando una licencia con cargo al tiempo acumulado, si alguno, u optar por reintegrarse o renunciar. *Estas son las mismas alternativas que tiene todo otro empleado o funcionario público que escoje libremente entrar en la política partidista y nominarse para un cargo electivo. No cabe sustentarse que el perjuicio es exclusivo de los maestros.*

Causa mayor consternación el señalamiento de que "en peor situación se encuentran aquellos [maestros] que fueron electos a puestos públicos y que el Tribunal Superior les privó de su derecho a una licencia sin sueldo durante la incumbencia en el cargo electivo. La decisión ... tiene el efecto de obligarlos a escoger entre renunciar al magisterio o no tomar posesión de sus nuevos cargos. Para estos maestros en particular, la decisión del foro de instancia los coloca en una angustiosa e insostenible encrucijada sin haber tenido la oportunidad de ser oídos. Para el Estado podría significar la pérdida de valiosos recursos humanos debido a las renuncias causadas por la implantación del decreto judicial". Opinión mayoritaria, pág. 78.

Este argumento es uno de los que más contundentemente demuestra que la acción mayoritaria del Tribunal paralizando está realmente fundamentada en la premisa inarticulada de favorecer —por sus consecuencias— la constitucionalidad del estatuto. De otro modo nada abonaría a la paralización. Veamos. Es innegable que, a menos que *se sostenga la constitucionalidad,* un fallo en contra afectará siempre —al menos en la tercera etapa de la ley— a aquellos maestros que ocupan cargos políticos. En ese momento tendrían que decidirse por el magisterio o el cargo público. De resolverse ahora o en los próximos días el recurso, esta disyuntiva desaparecería. La decisión sería previa a la toma de posesión del

cargo. Claramente esto es menos oneroso que si acontece después de comenzado ya el cuatrienio.

*En resumen, este es el momento ideal para resolver el recurso.* En términos temporales, el decreto del tribunal de instancia recayó en el período post eleccionario al finalizar un cuatrienio y próximo a comenzar otro. *Repetimos, esta peculiar situación es el mejor fundamento para que este Foro resuelva antes del inicio del próximo cuatrienio y de la fecha de juramentación de cargos electivos municipales y estatales. ¡No nos engañemos! Posponerla conlleva irremisiblemente que subsistan todas las consecuencias negativas apuntadas en apoyo de la orden de paralización.* Únicamente quedarán superadas con un dictamen *revocatorio que sostenga la constitucionalidad de este injustificado privilegio. Si ese es el sentir que ha inspirado a la mayoría, ¿por qué eludirlo?*

Finalmente, es erróneo afirmar que "la paralización no resultará en una erogación de fondos públicos adicionales en el futuro inmediato. Ya el Estado pagó por las licencias con sueldo y hasta las próximas elecciones los empleados públicos apelados no necesitarán que se les conceda este beneficio para equipararlos con los maestros". Opinión mayoritaria, pág. 78. Esta apreciación es incorrecta. Si un día después de las elecciones —etapa intermedia— algunos maestros decidieron reintegrarse a su antiguo cargo y estaban ocupadas sus plazas, o no había una vacante de la misma categoría en su distrito escolar, por ley el Departamento de Instrucción Pública estaba obligado a *prorrogar* la licencia especial *con paga* hasta la iniciación oficial del segundo semestre escolar. Nos preguntamos ante esta situación, ¿no constituye "una erogación de fondos públicos *adicionales*" *los sustanciales sueldos de los maestros que sustituyen*?

Estas realidades y peculiaridades justifican sin duda abstenernos de paralizar y, por el contrario, "adjudicar urgente-

mente la cuestión planteada al prescindir de ulteriores procedimientos apelativos . . .". Opinión mayoritaria, pág. 79.

En cuanto a la opinión mayoritaria, estos fundamentos "y el factor tiempo nos impide prudencialmente suscribirla. Del filósofo alemán Josef Pieper, en su obra *La Prudencia*, recordamos que el *'prudente contempla, por una parte, la realidad objetiva de las cosas* y, por otra, *el querer y el hacer, pero en primer lugar la realidad y, en virtud y a causa de ese conocimiento de la realidad, determina lo que debe hacer y lo que no debe hacer'*". (Énfasis suplido y en el original.) *Mundo Ríos v. Gobernador*, 121 D.P.R. 416, 428–429 (1988), opinión disidente del Juez Asociado Señor Negrón García.

### IV

La Ley Núm. 25, *supra*, dispone, en lo pertinente, que:

Cuando un maestro de instrucción pública en servicio activo sea oficialmente nominado para un cargo de elección popular por un partido político y decida aceptar su candidatura, quedará automáticamente relevado del servicio diurno y nocturno a partir de la fecha en que su candidatura quede definitivamente radicada en la Secretaría de Estado hasta pasadas las elecciones generales en Puerto Rico; Disponiéndose, que en tal caso el Secretario de Instrucción Pública concederá una licencia especial con paga al maestro concernido, desde la fecha de la radicación definitiva de su candidatura en el año de elecciones hasta un día después de celebradas las mismas. Esta licencia no será descontada de ningún otro tipo de licencia. En adición a dicha licencia con sueldo tendrá derecho a solicitar y disfrutar de licencia sin sueldo hasta la terminación del primer semestre escolar. De no salir electo podrá reintegrarse, si así lo deseare, a su antiguo cargo con los mismos derechos y prerrogativas que tuviere al momento de su separación. Si su plaza estuviere ocupada o si no hubiere una plaza vacante de la misma categor[í]a en su distrito escolar el Secretario de Instrucción Pública prorrogará la licencia especial con paga hasta la iniciación oficial del segundo semestre escolar. De salir electo, el Secretario de Instrucción Pública de-

berá concederle licencia sin sueldo por el período de su incumbencia en el cargo, si el maestro lo solicitare. 18 L.P.R.A. sec. 249d.

En *Pacheco v. Srio. Instrucción Pública*, supra, pág. 597, dijimos:

El tribunal de instancia [(Hon. Peter Ortiz, Juez)] concluyó, sin embargo, que la interpretación dada por el Secretario al citado estatuto "tiene el efecto de crear unas clasificaciones entre las distintas categorías de maestros" y que, "[cuando] estas clasificaciones afectan derechos constitucionales . . . . las mismas están sujetas a un escrutinio judicial estricto," siendo el Estado "el que tiene el peso de demostrar que la clasificación es permisible constitucionalmente y que su propósito es razonablemente necesario." Convenimos en que toda clasificación que afecte derechos constitucionales debe ser examinada con rigurosidad, particularmente en atención a la cláusula sobre igual protección de las leyes. *Pero aunque todo ciudadano tiene derecho a participar en los procesos democráticos que se activan en cada período eleccionario, cuando tal participación es solventada por el Estado mediante paga y beneficios especiales a determinados empleados públicos —como es el caso de la ley que nos ocupa— se crea un privilegio para una clase en particular que debe a su vez ser examinado y aplicado a base de un estricto escrutinio judicial.* (Énfasis suplido.)

Allí, en nuestra opinión disidente y en apoyo de un decreto de inconstitucionalidad, reconocimos que "el caso plantea crudamente el uso y erogación ilegal de fondos públicos con la conformidad y auspicios de una clase —magisterio— de gran ascendencia e influencia en el panorama político del país". *Pacheco v. Srio. Instrucción Pública*, supra, pág. 601. Expusimos:

. . . [R]eiteramos nuestra convicción judicial . . . de que el subsidio específico a los maestros por participar en campañas políticas, no resiste la prueba de estricto escrutinio judicial formulado en *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 277–278 (1975), y es inconstitucional. Apoyamos esta conclusión en varios fundamentos.

Se establecen distinciones discriminatorias, no s[ó]lo entre dicha clase, sino con referencia a los demás funcionarios gubernamentales, algunos de los cuales les está vedado postular sus candidaturas en las lides electorales. *Hermina González v. Srio. del Trabajo,* 107 D.P.R. 667 (1978). En este último caso, una mayoría del Tribunal suscribió el siguiente lenguaje, aplicable al de autos:

"[E]l discrimen y la erosión política no deben estar al servicio del empleado público-político activo. El interés del Estado en conservar un cuerpo de seguidores públicos diestros[,] competentes y objetivos, posterga toda consideración del reclamo personal del empleado para hacer campaña o lanzar su candidatura a cargo electivo desde la plataforma de su empleo. La incompatibilidad entre servir al pueblo y servirse a uno mismo hiere la retina. *La fundamental igualdad ante la ley impugna y excluye esta doble personalidad de servidor público y político, con ventajas y mecanismos de fomento del provecho personal que no tienen ni otros candidatos ni tampoco otros empleados.*" (Énfasis suplido y en el original, y escolios omitidos.) Íd., pág. 602.

## V

Reafirmamos una vez más la endeblez constitucional de este estatuto bajo dos (2) vertientes: las prohibiciones dimanantes del *espíritu* que informa al Art. VI, Secs. 9 y 10 de nuestra Constitución, *supra*, ed. 1982, pág. 373, en el sentido de que sólo se dispondrá de los fondos públicos para fines públicos, y ninguna ley concederá compensación a funcionario o empleado gubernamental "después que los servicios hayan sido prestados . . .". De esto se infiere el principio elemental de sana administración pública que proscribe el pago de sueldos por servicios no prestados. Ello no sólo es inconstitucional, sino inmoral.

Adicionalmente, el criterio aplicable a este recurso es el de revisión judicial estricta, según disponible en nuestro cuerpo doctrinario. *Alicea v. Córdova,* 117 D.P.R. 676 (1986); *Vélez v. Srio. de Justicia,* 115 D.P.R. 533 (1984); *Marina*

*Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983); *León Rosario v. Torres*, 109 D.P.R. 804 (1980); *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975).

> El escrutinio estricto le exige "al estado demostrar la existencia de un interés público apremiante o de superior jerarquía (*compelling state interest*) que justifique la clasificación y que la misma promueva necesariamente la consecución de ese interés". *Zachry International v. Tribunal Superior*, supra, págs. 277–278. *Dicho escrutinio será aplicado cuando la clasificación afecte derechos fundamentales o sea inherentemente sospechosa.* (Énfasis suplido.) *Alicea v. Córdova*, supra, pág. 688.

No tiene, pues, razón el Estado y los otros recurrentes en sostener que se trata de legislación económico-social. Ese análisis carece de densidad. Rechazamos, al decir de Ure, encerrarnos "en la rigidez glacial de proposiciones hundidas en fórmulas alejadas de la vida". E.J. Ure, *El Juez y la Duda*, Rev. Der. Penal y Criminal 224 (1969). *Después de todo, cualquier legislación conlleva elementos de carácter social y económico.* Ello obedece al hecho manifiesto de que toda ley se desparrama sobre la sociedad, su ejecución aspira a operar sobre una situación o un aspecto de la sociedad y produce, necesariamente, un impacto en la colectividad y en su economía. No debemos, pues, confundir esos elementos con lo que la doctrina judicial ha definido como *legislación económico-social*. Menos, caracterizarle como *económica* por razón de que implica erogación de fondos públicos. La justa y exacta calificación de una ley implica considerar su esencia y no detenerse sólo en sus aspectos secundarios e incidentales. Y esa esencia puede extraerse únicamente si se hace una revisión cuidadosa de tres (3) elementos fundamentales: su historial, su exposición de motivos —si alguno— y el texto mismo. Abordemos esa tarea.

Es absolutamente claro que la aprobación de esta ley tuvo un objetivo dual: reconocerle al maestro la plenitud de

sus derechos ciudadanos, a la par que proteger a los estudiantes de las escuelas públicas de la contaminación político-partidista durante los meses próximos a las elecciones.[3] Con el primer objetivo se liberó al maestro de la absurda y desafortunada prohibición contenida en la derogada Sec. 1 de la Ley Núm. 82 de 19 de agosto de 1925 (18 L.P.R.A. ant. sec. 249). Ésta disponía:

> Todos *los maestros* serán considerados como funcionarios del Gobierno Insular mientras estuviesen en servicio activo, mediante contrato debidamente firmado por el Comisionado de Instrucción, y *no tomarán parte activa en las campañas políticas en ninguna forma; Disponiéndose, sin embargo, que cuando un maestro fuere nominado para un cargo público de elección popular y deseare defender su candidatura, deberá renunciar inmediatamente su cargo en el magisterio.* (Énfasis suplido y en el original.) 1925 Leyes de Puerto Rico 579.

Así, en su afán de superar de manera radical y absoluta la injusta situación que por décadas sufrió nuestra clase magisterial, el legislador consignó en la Sec. 4 de la Ley Núm. 25, *supra*, la nueva realidad que los cobijaría:

> Se reconoce [el] derecho de los maestros de las escuelas públicas de Puerto Rico a participar en cualquier momento u ocasión en campañas y actividades políticas, a ser candidatos para cargos públicos electivos o de nombramiento, y a defender sus propias candidaturas o la candidatura de cualquier otra persona. 18 L.P.R.A. sec. 249b.

---

[3] "La preocupación más honda que ha tenido la Comisión en la consideración de este Proyecto ha sido doble, a saber: *La conveniencia de reconocer a los maestros de instrucción pública la plenitud de sus derechos ciudadanos y, en segundo lugar, el cuidado de que esta concesión y este reconocimiento no pudiera perjudicar,* en ningún momento, otro interés básico de la sociedad puertorriqueña, cual es *el de que los niños de las escuelas reciban de sus mentores la instrucción más pura, más clara y menos adulterada por la filiación política de los maestros.*" (Énfasis suplido.) 13 Diario de Sesiones de la Cámara (Ordinaria), T. I, págs. 317–318 (1960).

Esta sección de la ley no está bajo ataque ni representa problema constitucional alguno. Simplemente reconoce al maestro su derecho a participar de forma activa en la contienda política del país, *equiparándolos así al resto de los ciudadanos.* Sobre este extremo, resultan esclarecedoras las expresiones del entonces Presidente de la Comisión de Instrucción de la Cámara de Representantes, Sr. Aguedo Mojica Marrero: "consideramos que los maestros deben ejercitar la plenitud de su ciudadanía fuera del ámbito escolar y[,] en este ejercicio[,] no debe pesar sobre ellos ninguna vigilancia especial. La propuesta [Sec.] 5 contiene lo necesario para salvaguardar la escuela de la política. Fuera del aula el maestro se comportará como cualquier otro ciudadano responsable en una democracia."

Ahora bien, en cuanto al segundo propósito, de su historial legislativo disponible no hemos podido extraer interés apremiante alguno que justifique la licencia especial *con sueldo* concedida en la Sec. 6 de la Ley Núm. 25, *supra,* 18 L.P.R.A. sec. 249d. Tampoco encuentran apoyo los argumentos del Estado en defensa de su constitucionalidad. En resumen, éste alega que mediante la concesión de una licencia con sueldo se promueve el interés que tiene en asegurar que el maestro no participe en el proceso político-partidista mientras ejerce su función. No tiene razón. Veamos.

El P. de la C. 718, tal y como fue aprobado originalmente por la Cámara de Representantes el 1ro de marzo de 1960, no vislumbraba la concesión de una licencia especial con sueldo si el maestro no tenía el correspondiente tiempo acumulado. Es decir, el tiempo que disfrutaría de su licencia con sueldo debía descontársele de sus vacaciones acumuladas.

La razón dada para esta enmienda fue la siguiente:

> *La licencia con sueldo al maestro que es llamado a participar en la lucha política le dá la seguridad económica tan necesaria para la tranquilidad suya y de su familia* al propio tiempo que lo liberta de las limitaciones a que de otro modo

tendría que someterse en el cumplimiento de sus obligaciones pedagógicas.

Consideramos que con estas medidas se asegura el pleno ejercicio de los derechos políticos del maestro, y al propio tiempo se le asegura a la comunidad puertorriqueña los beneficios que ha de derivar de la participación plena en los procesos públicos de una de las principales clases directivas del país. (Énfasis suplido.) Informe al Subs. del Senado al Sust. al P. de la C. 718, 4 de mayo de 1969.

Por su parte, la Comisión de Instrucción del Senado redactó y sometió un proyecto sustituto en el que la licencia con sueldo no debía cargarse a las vacaciones acumuladas. Así fue aprobado por el Senado el 10 de mayo de 1969. 13 Diario de Sesiones de la Asamblea Legislativa (Ordinaria), T. 3, págs. 1116–1117 (1960).

Una vez el Senado devolvió el proyecto sustituto a la Cámara de Representantes, ésta enmendó la Sec. 6 del mismo a los efectos de limitar la licencia con sueldo a un máximo de sesenta (60) días y, además, le reconoció el derecho al maestro a disfrutar de una licencia sin sueldo hasta la terminación del primer semestre escolar. Informe de la Comisión de Instrucción de 2 de junio de 1960. Así fue finalmente aprobado.

*De este historial se desprende que con la sola autorización y licencia sin sueldo al maestro se lograban los objetivos originales.* Sin embargo, a título de privilegio, fueron ampliados para darle el sueldo con miras a "la seguridad económica tan necesaria para la tranquilidad suya y la de su familia". Además, el Procurador General nos aduce que con ello se establece un mecanismo de economía fiscal, de conveniencia administrativa para el Departamento de Instrucción Pública, se ayuda al maestro a recuperar "sus fuerzas tanto físicas como emocionales e intelectuales", y se les retiene en el servicio público de forma tal que, al éstos reintegrarse a las escuelas, benefician y enriquecen a sus alumnos con la experiencia adquirida en la contienda electoral o desempeño del cargo electivo.

No son persuasivos estos argumentos. El privilegio es innecesario y lastima "el postulado de igualdad inmerso en nuestra Constitución. Históricamente ese ideal ha cobrado vida en el esquema integral financiero trazado por la Asamblea Legislativa para lograr paridad económica entre los partidos políticos y los candidatos". *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 646 (1984). A fin de cuentas, "la levadura que hace crecer nuestro sistema democrático es el libre intercambio y el choque pacífico de ideas. La igual oportunidad económica para diseminarlas es requisito indispensable y consustancial a ese postulado". *P.S.P. v. Srio. de Hacienda*, 110 D.P.R. 313, 327 (1980).

Esta desigualdad oficial se patentiza con mayor dramatismo y crudeza en múltiples instancias. *Primero,* respecto al empleado público que no pertenece al magisterio y que se enfrenta como adversario político a un maestro que disfruta del privilegio de esta licencia con sueldo. La circunstancia es claramente arbitraria. Se da en este caso la situación anómala de que el Estado subsidia salarialmente a un empleado público —el maestro incumbente— durante la campaña electoral, en franco perjuicio de otro empleado que no puede acogerse a beneficio económico alguno. *¿Puede alguien sinceramente sostener y justificar esta desigualdad? ¿Es que sólo los maestros son acreedores a la "seguridad y tranquilidad" económica personal y familiar? Los otros empleados y funcionarios públicos, ¿no agotan también sus fuerzas físicas, emocionales e intelectuales en la campaña electoral? ¿Quiénes van a desgastarse más: los maestros sin tener que trabajar o los candidatos que no gozan de este privilegio y subsidio salarial electoral, y que tienen que —al decir del Procurador General— "trabajar en su campaña política fuera de las horas laborables y continuar desempeñándose como servidor[es] público[s]"? ¿Cabe argumentar economía fiscal para el Departamento de Instrucción Pública —luego de la licencia con sueldo por varios*

*meses— en virtud de igual licencia subsiguientemente pasadas las elecciones generales "hasta la terminación del primer semestre escolar", 18 L.P.R.A. sec. 249d? ¿Qué de los salarios que devengarán los maestros que sustituyan a los maestros candidatos? ¿No se está realmente duplicando parte de la nómina del Departamento de Instrucción Pública? ¿No atenta ello al recto y prudente sentido común de igualdad que debe animar a todos? Marrero v. Mun. de Morovis, supra. ¿Puede seriamente argumentarse que este esquema adelanta propósitos de conveniencia administrativa y economía fiscal?* La *segunda* situación resulta aún más dramática. Si bien es cierto que la mayoría de los empleados públicos *teóricamente* tienen el derecho a una licencia *sin* sueldo para defender su candidatura política, no es menos incontestable que su concesión es *discrecional*. Ese tratamiento conlleva un riesgo evidente. El alto grado de politización que experimenta nuestro país maximiza las posibilidades de ese candidato —que no pertenece al partido en el poder o, cuando menos, no es afecto al poder nominador en cuyas manos reside la autoridad decisoria— se vea negativamente afectado. El revanchismo político —característico de los cambios de poder en nuestro sistema gubernativo— sin duda se convierte en una amenaza efectiva contra el potencial disfrute de lo que en otras circunstancias debiera constituir un auténtico derecho. *El caso de autos es un buen ejemplo. Aquí, los empleados a quienes sistemáticamente les negaron las licencias —aún sin sueldo— pertenecían al P.N.P., principal opositor del Partido Popular Democrático (P.P.D.).* Tercero, al ponerse en vigor esta licencia *con* sueldo para los maestros, la Legislatura subsidia, además, a un empleado público frente a aquellos ciudadanos, también aspirantes, que no prestan servicios gubernamentales ni públicos. De este modo se logra ampliar sustancialmente los límites establecidos en el fondo electoral. Y, claro está, dependiendo del número de maestros coincidentes en una

misma afiliación partidista, se altera peligrosa e irremediablemente la paridad económica visualizada en la ley. "La idea de equilibrio, de equiparación situacional o, si se prefiere, de equivalencia de posibilidades de acción humana constituye una base indesplazable para la configuración de la noción de Justicia." J.C. Smith, *Fundamentos de la relatividad de la justicia*, 1983-B Rev. Jur. Arg. La Ley 1010 (1983).

Ante esta realidad, ¿cuánto tiempo más habrá que esperar para que alguna generación del Poder Judicial reivindique la norma de igualdad constitucional?

. . . [E]sta disposición de ley, en lugar de aislar la política partidista de las escuelas, la fomenta y promueve, desvirtuando el propósito legislativo de "mantener un ambiente docente libre de banderías, prejuicios y pasiones de toda clase." El estímulo y mensaje son claros, a saber: "maestro entra en política, que mientras se decide si eres o no electo, continuarás devengando tu sueldo sin que rindas servicio pedagógico alguno." Ello es así pues para un maestro beneficiarse de la licencia con paga tiene que ser certificado como candidato de manera oficial. Esto implica que previamente habrá realizado activamente una campaña como aspirante de un partido político o como candidato independiente en el proceso primarista o de pre-candidatura, cuando todavía labora como maestro.

Esta ley ilustra c[ó]mo en una sociedad erigida sobre bases democráticas, el péndulo puede oscilar a extremos irrazonables y peligrosos, a saber, desde una prohibición estatutaria al magisterio de participar activamente en la política (Sec. 52 de la Ley Escolar Compilada aprobada en 12 de marzo de 1903) hasta la eliminación de este interdicto legislativo con el exceso de una licencia especial con sueldo sin rendir servicio alguno. (Escolio omitido.) *Pacheco v. Srio. Instrucción Pública*, supra, pág. 603.

La paralización de hoy de los efectos del *injunction*, fundada en la alegada fuerte probabilidad de prevalecer el Estado, constituye un ominoso presagio de que a la larga continuará vigente este inicuo privilegio. *A los auspicios de los*

*privilegios de la clase magisterial de mayor ascendencia e influencia en el panorama político del país, se suma hoy el Tribunal Supremo.* El recíproco "usufructo histórico que ata esta ley a los partidos políticos y maestros . . . cobijados bajo la misma" —*Pacheco v. Srio. Instrucción Pública,* supra, pág. 601— aparentemente lo han elevado de categoría *legal* a una *sacramental.*

—O—

Voto particular emitido por el Juez Asociado Señor Rebollo López.

A pesar de que suscribimos *la Resolución* emitida por el Tribunal en el presente caso, rehusamos endosar la opinión mayoritaria. Veamos por qué.

I

No debe haber duda en la mente de persona alguna sobre el hecho de que un recurso de apelación, en que el Estado apela de una sentencia emitida por el Tribunal Superior en la cual se declara inconstitucional una ley, efectivamente plantea una cuestión constitucional sustancial, razón por la cual este Tribunal viene en la "obligación" de considerar o darle curso a dicho recurso. Después de todo, y en relación con ello, debe mantenerse presente lo dispuesto por el Art. V, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, a los efectos de que ninguna ley será declarada inconstitucional a no ser por una mayoría del numero total de los Jueces *de este Tribunal.*

Ese, precisamente, es el caso que ocupa nuestra atención; esto es, el Estado apela de una sentencia declarando inconstitucional la Sec 6. de la Ley Núm. 25 de 3 de junio de 1960 (18 L.P.R.A. sec. 249d). Aparte del criterio expresado y firme del Señor Juez Negrón García a los efectos de que la citada disposición legal es efectivamente inconstitucional,

una lectura de las opiniones mayoritarias y disidentes revela que el punto principal que las diferencia y divide es en relación al "momento apropiado" en que se debe resolver el caso; esto es, si sumariamente como sostiene el Señor Juez Negrón García, o si luego de que todas las partes puedan exponer sus criterios al efecto, como sostiene la opinión mayoritaria emitida.

Estando envuelta una cuestión estrictamente de derecho, nos preguntamos nosotros: en lugar de haber dejado transcurrir un término de tres semanas —el recurso del Estado fue radicado el 28 de noviembre de 1988— en el cual término se hubiera podido haber requerido de todas las partes que comparecieran y expusieran por escrito sus respectivas posiciones, ¿no hubiera sido preferible así haber actuado, y el Tribunal haber resuelto el caso en los méritos, en lugar de emitirse una opinión mayoritaria "interlocutoria", la cual en realidad no resuelve nada?

Somos del criterio que los integrantes de este Tribunal deben dedicar todos sus esfuerzos, tiempo y empeño en asuntos más productivos y útiles.