HON. DAVID NORIEGA, por sí y como representante de la CÁMARA DE REPRESENTANTES, apelante, *v.* HON. RAFAEL HERNÁNDEZ COLÓN, AUTORIDAD DE TELÉFONOS DE PUERTO RICO, PUERTO RICO TELEPHONE COMPANY, RAMÓN CANTERO FRAU, BANCO GUBERNAMENTAL DE FOMENTO y OTROS, apelados.

*Número:* AC-90-253          *Resuelto:* 6 de abril de 1990

*Víctor García San Inocencio, Juan Santiago Nieves* y *José Juan Nazario De la Rosa,* de *Nazario & Santiago,* abogados del apelante; *Jorge E. Pérez Díaz, Procurador General, Norma Cotti Cruz, Subprocuradora General Interina,* y *María Adaljisa Dávila, Procuradora General Auxiliar,* abogados del Gobernador de Puerto Rico; *Lino J. Saldaña,* abogado del Banco Gubernamental de Fomento; *Salvador Antonetti,* abogado de la Autoridad de Teléfonos de Puerto Rico y de la Puerto Rico Telephone Company, apelados.

## RESOLUCIÓN

Considerada la resolución emitida por el tribunal de instancia como una sentencia final dispositiva del caso en los méritos, denegando la solicitud de *injunction* permanente, se desestima la apelación por no plantear una cuestión constitucional sustancial.

Considerado el recurso como una solicitud de revisión, *no ha lugar.*

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General. Los Jueces Asociados Señores Rebollo López y Hernández Denton emitieron votos concurrentes. El Juez Asociado Señor Negrón García emitió un voto disidente. El Juez Asociado Señor Ortiz no intervino.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

—O—

Voto concurrente emitido por el Juez Asociado Señor Rebollo López.

El presente recurso nos brinda la oportunidad de expresarnos sobre dos fundamentales cuestiones, a saber: la aplicabilidad de la doctrina de acción legitimada a los miembros de la Asamblea Legislativa de Puerto Rico y la interacción entre la facultad del Poder Ejecutivo de nuestro Gobierno para promover y formular política pública y el mandato constitucional contenido en la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1.

I

Exponemos, brevemente, los hechos pertinentes que originan el recurso de apelación que ocupa nuestra atención. El Hon. David Noriega Rodríguez "por sí y como representante a la Cámara de Representantes" de Puerto Rico radicó ante el Tribunal Superior de Puerto Rico, Sala de San Juan, contra los demandados del epígrafe una petición de *injunction* preliminar, y permanente, en la que alegó que la utilización de fondos públicos por la Rama Ejecutiva en una campaña publicitaria difundida con el propósito de promover la venta de la "Telefónica" contravenía la política pública establecida en la Ley Núm. 25 de 6 de mayo de 1974 (27 L.P.R.A. sec. 401 *et seq.*); razón por la cual ello constituía un uso indebido de fondos públicos a la luz de las disposiciones de la Ley Núm. 230 de 23 de julio de 1974 (3 L.P.R.A. sec. 283 *et seq.*) y de

la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, ante. No se llevó a cabo vista evidenciaria alguna; se celebró, sin embargo, una vista donde las partes tuvieron la oportunidad de argumentar respecto a la procedencia jurídica de sus respectivas posiciones. El tribunal de instancia denegó el *injunction* solicitado. Inconforme, el licenciado Noriega Rodríguez acudió ante este Tribunal imputándole error a dicho foro al así actuar.

## II

Conforme mandato ineludible de nuestro ordenamiento, toda persona que acude ante los tribunales de justicia de nuestro país tiene que salvar la barrera u obstáculo invisible de la "capacidad" para demandar ("acción legitimada" o *standing*). No obstante lo antipático que nos pueda resultar en el plano personal el cuestionamiento y la discusión de dicho requisito procesal en el presente caso[1] —y aun cuando dicha materia no fue objeto de consideración por el tribunal de instancia, como tampoco ha sido objeto de argumentación y discusión por las partes ante este Tribunal— el descargo responsable y objetivo del cargo que ocupamos hace necesario que nos enfrentemos al mismo y discutamos, aun cuando someramente, la doctrina sobre "acción legitimada" desde los dos puntos de vista pertinentes a los hechos del caso, a saber: la "acción del contribuyente" y la "acción del legislador".

Resulta, cuando menos, curioso, que a todo lo largo del procedimiento seguido en el presente caso se haya obviado un aspecto medular relativo a la petición de *injunction* radicada: la aplicabilidad de la doctrina de acción legitimada al apelante Noriega Rodríguez. Dados los hechos particulares del caso, dicha

---

[1] El apelante en el presente recurso, Hon. David Noriega Rodríguez, ha venido llevando a cabo una efectiva y encomiable campaña contra la corrupción y el despilfarro de fondos públicos en nuestro Gobierno; campaña que, no hay duda, resulta en beneficio de todos los puertorriqueños.

cuestión tiene que ser examinada, en abstracto,[2] desde dos vertientes: el apelante como persona privada y en su capacidad de miembro de la Cámara de Representantes.

En cuanto al primer aspecto, esto es, en su carácter de ciudadano particular, resulta obvio e indiscutible que el licenciado Noriega Rodríguez *no* tiene *standing* para radicar la petición de *injunction*. Como es sabido, en Puerto Rico se eliminó desde el año de 1946, *por legislación a esos efectos*, la acción de un "contribuyente" para cuestionar los gastos en que incurre el Gobierno de Puerto Rico, negándosele expresamente jurisdicción a los tribunales para considerar y dilucidar una acción a esos efectos. Véanse: Leyes Núm. 1 y Núm. 2 de 25 de febrero de 1946 (32 L.P.R.A. secs. 3524 y 3074); *Suárez v. Tugwell, Gobernador*, 67 D.P.R. 180 (1947). Dicha acción legislativa, según ello surge de la Exposición de Motivos de la citada Ley Núm. 2, tuvo el propósito de impedir la radicación de demandas donde se cuestionaba "la legalidad o la constitucionalidad de leyes y actuaciones de funcionarios públicos autorizados por ley, por personas que no han sufrido daño real alguno como resultado de las mismas, *y que alegan el derecho a demandar meramente por el hecho de ser contribuyentes* ". (Énfasis suplido.) 1946 Leyes de Puerto Rico 7.

En relación con la segunda vertiente, esto es, la "capacidad" del licenciado Noriega Rodríguez para radicar la acción aquí en controversia en su carácter de miembro de la Cámara de Representantes, resultan particularmente ilustrativos los comentarios del Profesor Serrano Geyls a los efectos de que:

> Bajo este epígrafe se analiza la acción legitimada que tiene un legislador, ya sea estatal o federal, en su capacidad como tal. Por lo general, ambos tienen los mismos derechos. Véase, Benck, *Standing for State and Federal Legislators*, 23 Santa Clara L. Rev. 811, 821 (1983).
>
> Los tribunales han establecido que "ningún criterio especial" o "técnica de análisis" debe ser utilizado en casos de legisladores, distintos de los que se usarían para definir la acción legitimada de

---

[2]   Ello debido a la ausencia de una vista evidenciaria.

una persona ordinaria. *Harrington v. Bush*, 553 F2d. 190, 204 (Cir. D.C. 1977). Por la situación del legislador, los tribunales han tenido problemas al desarrollar criterios para medir la naturaleza de los daños sufridos. Esto se debe a que [el] Tribunal Supremo no ha podido discutir los criterios. El Tribunal tuvo oportunidad de hacerlo en *Idaho v. Freeman*, 459 U.S. 809 (1982), pero no pudo porque la controversia se hizo académica.

La jurisprudencia federal, en la realidad, le impone a los legisladores criterios más estrictos de acción legitimada que a las demás personas. Es así porque un legislador tiene un interés distinto del que tiene un ciudadano ordinario. *Reus v. Baller*, 584 F. 2d. 461, 465 (Cir. D.C. 1978). Los tribunales han determinado que un legislador de hecho no recibe ningún daño si tiene disponible remedios colegiales o políticos.[3]

De lo antes citado claramente se desprende que los legisladores, *meramente por fungir como tales, no* están exentos de la doctrina tradicional sobre "acción legitimada". Resulta pertinente señalar que hasta el presente, nuestras decisiones le han reconocido acción legitimada o *standing* a los legisladores en aquellas acciones que han radicado en las cuales éstos demostraron que la conducta observada por los demandados, y que ellos cuestionaban, "lesionaba" su capacidad, o prerrogativas, como miembros de la Asamblea Legislativa. A manera de ejemplo, véanse: *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982).[4]

---

[3] R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 169.

[4] En *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986), un miembro del Senado de Puerto Rico cuestionó la constitucionalidad de una disposición de un reglamento aprobado por el Senado para investigar los "Sucesos del Cerro Maravilla" que impedía que dicho Senador participara, y descargara sus responsabilidades como tal, en unas llamadas sesiones ejecutivas de la Comisión de lo Jurídico del Senado.

En *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982), se alegó que la conducta observada por el entonces Gobernador de Puerto Rico, Hon. Carlos Romero Barceló, al abstenerse de enviar para la consideración correspondiente por el Senado de Puerto Rico los nombramientos de los miembros de su gabinete, impedía que el Senador descargara su función constitucional en esta clase de situaciones.

En dichas situaciones, los legisladores demandantes tenían capacidad para radicar la acción allí en controversia por razón de que la conducta observada por los demandados efectivamente lesionaba las prerrogativas de sus cargos como legisladores.

En lo que respecta al caso específico ante nuestra considera-
ción —donde se solicita la expedición de un *injunction*— la
*aplicación estricta* de la doctrina antes señalada significa que el
apelante Noriega Rodríguez viene en la "obligación" de demos-
trar que la acción del Ejecutivo al embarcarse en una campaña
publicitaria en promoción de la propuesta venta de la Telefónica le
causa una "lesión" en su capacidad de, o a las prerrogativas de su
cargo como, miembro de la Cámara de Representantes. Véase
*Peña v. Federación de Esgrima de P.R.*, 108 D.P.R. 147, 154
(1978). En un obvio intento de cumplir con ese requisito, el
apelante alegó y señaló —en la pág. 3, párrafo 9 de la Petición
Enmendada de *Injunction* que radicara— que los actos del Poder
Ejecutivo "lesionan las prerrogativas del demandante y el ejerci-
cio de su derecho al voto como miembro de la Asamblea Legisla-
tiva".

¿Es ello correcto? Contestamos en la negativa. Recordemos,
en primer lugar, que al no haberse celebrado vista evidenciaria a
nivel de instancia, no contamos con prueba alguna a esos efectos.
Por otro lado, el apelante no señala ni especifica cuáles de sus
prerrogativas como legislador son las que resultan afectadas por
la acción del Poder Ejecutivo. Tampoco nos informa de qué
manera se afecta el ejercicio de su derecho al voto como miembro
de la Cámara de Representantes. En adición a lo anteriormente
expresado, tomamos conocimiento judicial de que el apelante
Noriega Rodríguez ha estado participando, en su capacidad de
legislador, en las vistas públicas que ha venido celebrando la
Cámara de Representantes en relación con el mencionado pro-
yecto de ley para autorizar la venta de la Telefónica, interrogando
a las distintas personas que han despuesto ante las Comisiones
pertinentes de dicho Cuerpo Legislativo. Aparte de ello, no hay
prueba alguna ante este Tribunal que demuestre que el apelante
está impedido de intentar convencer a sus compañeros legislado-
res de la posición que, respecto a dicho proyecto de ley, él
propulsa; como tampoco existe indicio alguno de que el apelante
no podrá participar en la consideración y votación que en el

hemiciclo del referido organismo legislativo se lleve a efecto en un futuro respecto al mencionado proyecto de ley.

*¿Significa lo anteriormente expresado que el apelante Noriega Rodríguez* —en la medida que no ha demostrado haber sufrido un daño o lesión en sus prerrogativas como legislador— *carece de acción legitimada ("standing") para impugnar la utilización de fondos públicos en la campaña publicitaria en que se ha embarcado el Poder Ejecutivo en relación con el proyecto de venta de la Telefónica?*

A pesar de que en el caso específico del apelante Noriega Rodríguez su elección a la Cámara de Representantes no se debió al "innovador mecanismo para garantizar la representación efectiva de las minorías en la Asamblea Legislativa" que constituye la Sec. 7 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1 —*Silva v. Hernández Agosto*, ante, pág. 69— nuestro sistema constitucional contempla como fin básico de "la salud democrática [de nuestro país] que las minorías tengan una representación que, aun bajo las circunstancias más desfavorables, *les permita cumplir adecuadamente su función de fiscalizar* y estimular a la mayoría en su obra de gobierno sin crear entorpecimientos que puedan resultar en detrimento de la democracia". (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2590 (1961).

El apelante Noriega Rodríguez, no hay duda, pertenece a esa minoría parlamentaria. En tal capacidad, tiene un "mandato" de los forjadores de nuestra Constitución para fiscalizar, en forma responsable, las actuaciones no sólo de la mayoría parlamentaria sino del Gobierno de Puerto Rico en general. Ello, naturalmente, incluye las actuaciones del Poder Ejecutivo. Somos del criterio que la Rama Judicial viene en la obligación de reconocer ese "mandato" constitucional que le concede, por decirlo así, acción legitimada o *standing* a esa minoría parlamentaria para cuestionar ante nuestros tribunales aquellas actuaciones que, en la informada opinión de esa minoría, atenten contra los mejores intereses de nuestro pueblo.

No hay razón válida para así no hacerlo. En *Hernández Agosto v. Romero Barceló*, ante, citamos con aprobación —sin vacilación de clase alguna— jurisprudencia federal que reconoce la capacidad jurídica (*standing*) de las *cámaras* legislativas para comparecer ante los tribunales.(5) Ante la *posibilidad* de una acomodaticia negativa de actuar de una mayoría parlamentaria, basada la misma en intereses puramente partidistas, no debemos cerrarle las puertas de nuestros tribunales a una minoría que, en adición a trabajar por sus intereses particulares, también clama y aboga por el bienestar común de nuestro país. El hacerlo podría tener la consecuencia de que actuaciones de una mayoría parlamentaria y del Poder Ejecutivo —controlados por un mismo partido político— que puedan tener unos efectos y consecuencias fundamentales para nuestro pueblo no puedan ser fiscalizadas y revisadas judicialmente.

Esa capacidad (*standing*), sin embargo, *no* puede ni debe permitirse que se ejercite por esa minoría parlamentaria en *toda* clase de situaciones. Ello podría tener la nefasta consecuencia de paralizar la obra de gobierno, situación que se quiso evitar mediante la aprobación de las antes citadas Leyes Núms. 1 y 2 de 25 de febrero de 1946. Su facultad de fiscalizar como hemos visto, en palabras de los miembros de la Asamblea Constituyente, *no* les autoriza para "crear entorpecimientos que puedan resultar en detrimento de la democracia". Diario de Sesiones, ante, pág. 2590. Es por ello que somos del criterio que la capacidad (*standing*) que hoy le reconocemos para comparecer ante los tribunales tiene que, por necesidad, estar limitada a casos "de gran interés público . . .". *Hernández Agosto v. Romero Barceló*, ante, pág. 411.

El presente recurso, no hay duda, envuelve una controversia de gran interés público. Es por ello que, aun en ausencia de una demostración por parte del apelante Noriega Rodríguez de que sufrió una lesión en sus prerrogativas como legislador, le reconocemos acción legitimada (*standing*) en la presente acción.

---

(5)  *Hernández Agosto v. Romero Barceló*, ante, pág. 415.

## III

Superada la barrera jurisdiccional, esto es, la "capacidad" del apelante Noriega Rodríguez para radicar la petición de *injunction* en controversia, pasamos brevemente a considerar la juridicidad de su planteamiento a los efectos de que la actuación del Poder Ejecutivo al utilizar fondos públicos en una campaña publicitaria en pro de la venta de la Telefónica es una que contraviene la política pública establecida mediante la citada Ley Núm. 25 de 6 de mayo de 1974 y, en consecuencia, constituye un uso indebido de fondos públicos por el Poder Ejecutivo a la luz de las disposiciones de la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, ante.

No estamos de acuerdo. No tenemos duda alguna en nuestra mente de que el Gobernador de Puerto Rico, al igual que la Asamblea Legislativa de Puerto Rico, tiene la facultad o poder de formular y establecer política pública en nuestro país. Ello, a nuestro juicio, incluye la facultad de propulsar cambios a una política pública existente.

Si es perfectamente válido —como, inclusive, lo reconoce el compañero Juez Negrón García en su vehemente disenso— que el Primer Ejecutivo del país utilice fondos públicos en la realización de investigaciones y estudios preliminares de viabilidad y conveniencia "para encaminar cambios en la política pública existente" —(énfasis suprimido) opinión disidente, pág. 61— ¿cómo es posible que se le niegue facultad a éste para utilizar fondos públicos en una campaña publicitaria respecto al cambio de política pública que propulsa? La única diferencia entre ambas gestiones radica en que la primera resulta ser necesaria, por cuanto la decisión de propulsar un cambio de política pública debe ser una "informada", y la segunda tiene visos de ser innecesaria. Ahora bien, el hecho de que una persona, a juicio de otras, utilice un poder o facultad que tiene en forma equivocada o innecesaria no implica que el poder sea inexistente.

Somos del criterio que la controversia ante nuestra consideración parece ser más difícil de lo que en realidad es precisamente

debido a lo antes señalado. Ello, sin embargo, no es de la incumbencia de la Rama Judicial.

La sabiduría y propiedad de las gestiones realizadas por el Ejecutivo en relación con la referida campaña publicitaria necesariamente tendrán que ser juzgados en otro foro que no sea el judicial.

—O—

Voto concurrente emitido por el Juez Asociado Señor Hernández Denton.

Por considerar que al amparo de nuestro ordenamiento constitucional el Gobernador tiene autoridad para utilizar fondos públicos con el propósito de formular cambios en la política pública y promover la legislación correspondiente, y que la prudencia judicial aconseja que no intervengamos en la controversia sobre la razonabilidad de los gastos o los medios utilizados para lograr esos propósitos, suscribo este voto concurrente con la resolución del Tribunal que en el ejercicio de su discreción *únicamente* se niega a revisar la decisión recurrida. Esta disposición tiene el efecto de reconocer la legalidad de las actuaciones del Primer Ejecutivo.

I

En su recurso, el apelante Hon. David Noriega impugna la decisión del Tribunal Superior que deniega su solicitud de *injunction* contra el Gobernador Rafael Hernández Colón, el Banco Gubernamental de Fomento, la Autoridad de Teléfonos y la Puerto Rico Telephone Company, para que cesen y desistan de propiciar una campaña publicitaria sufragada con fondos públicos con el fin de promover la venta de los activos de la Telefónica.[1]

El Tribunal Superior concluyó que "la campaña publicitaria en ningún momento viola la política pública establecida en la Ley

---

[1] Este Tribunal consideró la decisión del Tribunal Superior como una sentencia final dispositiva del caso.

Orgánica que crea la Autoridad de Teléfonos de Puerto Rico". Resolución, pág. 7. También determinó específicamente que "el uso de fondos públicos para sufragar dicha campaña política no contraviene lo dispuesto en la Sección 9, Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico". Íd. Por lo tanto, resolvió que la referida campaña publicitaria pagada con fondos públicos no era ilegal y sostuvo la validez de la gestión pública del Gobernador de proponer cambios en la legislación.

## II

Aunque la determinación que tomen las otras ramas de gobierno sobre lo que constituye un fin público es revisable por el Poder Judicial, al descargar nuestra función revisora debemos actuar con mesura, prudencia, respeto y deferencia a los otros poderes públicos. "Dependiendo de la materia presente en la determinación de [un] fin público, el Poder Judicial debe considerar el grado de competencia que tienen las otras Ramas de Gobierno para establecer la política pública del estado." *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 611–612 (1988). Al amparo de estas normas de revisión judicial, examinemos la controversia de autos.

Ante nos el Representante Noriega postula que la campaña de información pública del Gobierno es ilegal porque la Asamblea Legislativa no ha aprobado la venta de la Telefónica. La tesis del peticionario Noriega, acogida por el voto disidente del Juez Asociado Señor Negrón García, lo que realmente sostiene es que en ausencia de un poder expresamente delegado por la Rama Legislativa, el Gobernador del Estado Libre Asociado no tiene facultad para utilizar fondos públicos para *concebir, formular* y *promover* cambios en la legislación vigente y en la política pública del país. No podemos refrendar esta tesis errónea e incompatible con nuestro sistema republicano de gobierno. Aceptarla conllevaría que endosáramos su premisa inarticulada de que el poder político en nuestro país está concentrado en una rama del gobierno: la Legislativa. Esta estructura gubernamental, característica de los sistemas parlamentarios, fue expresamente des-

cartada por la Convención Constituyente y es totalmente contraria a la teoría de separación de poderes adoptada en nuestra Constitución. Al distribuir los poderes entre tres (3) ramas *iguales* e *independientes* se evita la concentración indebida de poderes en una de ellas y se garantiza la libertad individual y colectiva de los ciudadanos. Véanse: *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 427–428 (1982); *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 612–622 (1983).

La Constitución del Estado Libre Asociado de Puerto Rico adoptó también el complejo sistema de pesos y contrapesos de la Constitución de Estados Unidos que asegura una interacción entre los tres (3) componentes del sistema de gobierno y genera un equilibrio dinámico que evita que alguna de ellas amplíe su autoridad, debilitando así a la otra. Véanse: *Bowsher v. Synar*, 478 U.S. 714, 727 (1986); *INS v. Chadha*, 462 U.S. 919 (1983); R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1986, Vol. I, págs. 580–581.

De acuerdo con este esquema de gobierno, nuestra Constitución otorgó al Primer Ejecutivo la facultad de originar acción legislativa al requerir que presente anualmente a la Asamblea Legislativa un mensaje sobre la situación del país con "los datos necesarios para la formulación de un programa de legislación". Art. IV, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 349. A tenor con esta facultad, todos los gobernadores electos que han dirigido los destinos de nuestro país han utilizado esa oportunidad para proponer nueva legislación y cambios en la política pública para implantar sus respectivos mandatos electorales y para atender los problemas más apremiantes del país.

Para complementar estos poderes, la Constitución también autoriza al Gobernador a convocar sesiones extraordinarias de los cuerpos legislativos *"cuando a su juicio los intereses públicos así lo requieran"*. (Énfasis suplido.) Const. E.L.A., *supra*, pág. 349. Al amparo de esta disposición, todos los gobernadores han convocado a la Asamblea Legislativa para considerar proyectos de administración dirigidos a resolver aquellos asuntos que no fueron

atendidos en las Sesiones Ordinarias. La Constitución concede al Primer Ejecutivo la facultad para decidir los asuntos a ser tratados por la Sesión Extraordinaria y la duración de la misma. También se le autoriza a vetar o disminuir partidas específicas de cualquier proyecto de ley de asignación de fondos. Art. III, Sec. 20, Const. E.L.A., L.P.R.A., Tomo 1. Esta cláusula, no incluida en la Constitución federal, permite al Primer Ejecutivo intervenir directamente en el proceso presupuestario vetando partidas individuales con las cuales no esté de acuerdo, y lo faculta a reducir los totales correspondientes según su mejor criterio.

Además, la Constitución expresamente reconoce y autoriza al Gobernador a ejercer *"las otras facultades y atribuciones"* inherentes a su cargo. (Énfasis suplido.) Art. IV, Sec. 4, Const. E.L.A., *supra*, pág. 349. Esta última disposición constitucional reconoce que el Primer Ejecutivo tiene unos poderes inherentes que no están específicamente enumerados por la Constitución o por la ley.[2]

De las memorias de la Convención Constituyente se desprende que sus miembros rechazaron el sistema parlamentario y decidieron fortalecer al ejecutivo concediéndole al Gobernador *poderes* que le permitieran responder a los cambios sociales y políticos del país. Véase J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, págs. 116–117. Para evitar una limitación indebida del Poder Ejecutivo, la Convención Constituyente eliminó una disposición del proyecto original. Uno de los miembros más destacados de dicha Convención, el delegado Lcdo. Víctor Gutiérrez Franqui, explicó las razones para la enmienda incorporada en el debate plenario:

> Entonces, leyendo este artículo como fue aprobado en la Comisión Total, nos pareció que insertar esta expresión: "ejercer la dirección general del poder ejecutivo del gobierno", podía aparecer como una limitación a la sección 1 donde se decía que "el poder

---

[2] Lo mismo sucede con el poder ejecutivo concedido al Presidente de Estados Unidos por la Constitución federal. Véase L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 210–213.

ejecutivo", "el poder ejecutivo . . ." cual es, "se ejercerá por un gobernador".

Si aquí decimos que su atribución y función es supervisar, la dirección general, eso no es de ser jefe supremo del poder ejecutivo, a nuestro juicio, sino que más bien es una limitación de esa facultad.

Entendimos, que la forma de corregir la posible duda, era eliminar esta frase en su totalidad con esta explicación como propósito de la enmienda, para que resultara claro de la acción de esta Convención, que había sido su propósito, investir a este funcionario ejecutivo, a este jefe ejecutivo con la facultad y la autoridad suprema en el poder ejecutivo, sin limitaciones de ninguna clase.

El compañero Quiñones parece que entiende que restituyendo la frase, con la frase de jefe ejecutivo, se mantiene la claridad de la intención de la Convención de que la investidura de facultad y poder ejecutivo que se hace en este funcionario Gobernador, es absoluta en su ramo. Esa es la diferencia que hay entre el lenguaje que sugiere el compañero Quiñones y el lenguaje que yo solicito que se elimine. 3 Diario de Sesiones de la Convención Constituyente 2272 (1961).

Referente a la controversia particular en este caso, en conformidad con su mandato constitucional, el Gobernador compareció el 20 de febrero de 1990 a informar sobre el estado del país. En su mensaje describió los esfuerzos de las Ramas Ejecutiva y Legislativa para reformar la educación pública. Con el propósito de instrumentar la reforma educativa concebida por los dos (2) poderes públicos, se propuso la creación de un fondo especial de 1 billón de dólares. *Mensaje del Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Rafael Hernández Colón, sobre el estado de situación del país a la Undécima Asamblea Legislativa en su Tercera Sesión Ordinaria,* San Juan, 20 de febrero de 1990, págs. 67–68. Para crear ese fondo especial, el Gobernador anunció que sometería legislación para vender la Telefónica y para enmendar la Constitución, y así garantizar la existencia perpetua de los fondos y el uso apropiado de utilidades. Íd., pág. 69.

Con el propósito de explicarle al país los méritos de esta propuesta y contestar las interrogantes expuestas por los diversos grupos afectados, la Rama Ejecutiva inició una extensa campaña de información pública sobre los diversos aspectos del

proyecto a través de todos los medios de comunicación. Simultáneamente, sometió a la Asamblea Legislativa un proyecto de ley para autorizar la venta de la Telefónica y establecer los términos y condiciones de la transacción.

Al amparo de sus poderes inherentes, el Gobernador tiene la facultad y el deber de informar sobre las medidas que ha tomado y los planes concebidos para atender los problemas del país. Es inconcebible que en esta etapa de nuestra historia política un miembro del Poder Legislativo en un sistema republicano de gobierno pretenda imponerle al Gobernador de Puerto Rico una mordaza para impedir que explique sobre su obra gubernamental. En asuntos públicos, en la democracia resulta más saludable el deber de informar que la obligación de callar.

De sostenerse la petición del Representante Noriega y la tesis elaborada por el Juez Asociado Señor Negrón García en su voto disidente, la Asamblea Legislativa podría efectivamente impedir que un Primer Ejecutivo de otro partido político pueda utilizar fondos gubernamentales para proponer nuevos programas de gobierno en conflicto con la legislación vigente. El resultado de la acción propuesta sería debilitar peligrosamente el alcance del Poder Ejecutivo, socavando el equilibrio dinámico que debe prevalecer en un sistema de separación de poderes y creando por fíat judicial un sistema parlamentario de gobierno. Desde este estrado apelativo no podemos cambiar el ordenamiento constitucional para crear una rama con más poderes que las otras. *Para conservar el equilibrio dinámico que requiere el sistema de separación de poderes, las tres (3) ramas deben estar equiparadas. Ninguna debe ser superior a las otras.* El cambio de este ordenamiento únicamente corresponde al Pueblo de Puerto Rico, y así está expresamente reservado en el Preámbulo de la Constitución y salvaguardado en los procedimientos de enmienda dispuestos en el Art. VII, Sec. 1 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1.

Aunque nos corresponde la función constitucional de ser los intérpretes finales de la Constitución, la prudencia judicial aconseja que no emitamos un juicio sobre la *razonabilidad de los*

*gastos en que incurrió o los medios que utilizó el Primer Ejecutivo para informar sobre los planes trazados referentes a la venta de la Telefónica.* Tampoco podemos ceder a la tentación de intervenir en una controversia de interés para todo el país sobre los méritos y el valor de una campaña publicitaria utilizada por el Gobernador para promover un cambio en la política pública.

En vista de que no hay criterios o normas judiciales para que desde este estrado apelativo nos pronunciemos sobre la sabiduría del cambio en la política pública o la razonabilidad de los gastos en que se incurrió en su diseño y promoción, *Silva v. Hernández Agosto*, 118 D.P.R. 45, 53–58 (1986), debemos limitar nuestra intervención únicamente a examinar si el Gobernador tiene el poder constitucional para proponer y realizar cambios en la política pública. *No debemos asumir que todos los asuntos públicos son susceptibles de determinación judicial o que la toga nos otorga un poder omnipotente o una sabiduría indefectible.* "En materia de interpretación constitucional carecemos del encanto de la magia y del hechizo esférico de la consabida bola de cristal." *Pueblo Int'l, Inc. v. Srio. de Justicia*, 122 D.P.R. 703, 743 (1988), opinión concurrente del Juez Asociado Señor Negrón García.

No debe perderse de perspectiva que la controversia sobre la campaña publicitaria es exclusivamente de tipo político y que en nuestro sistema democrático estos litigantes tienen otros foros disponibles para dilucidar los méritos de sus respectivas posiciones. En última instancia, será el Pueblo de Puerto Rico y *no el Poder Judicial* quien tomará la decisión final sobre su programa de gobierno. Después de todo, *en nuestro sistema de separación de poderes, el Poder Judicial también tiene sus límites y no participa del don divino de la infalibilidad.*

Independientemente de nuestras opiniones personales sobre los méritos de la venta de los activos de la Telefónica, y sin recurrir a sofismas o visiones apocalípticas, el análisis jurídico revela que el Gobernador tiene los poderes constitucionales para formular y proponer cambios en la política pública y que puede

utilizar fondos gubernamentales para informar al pueblo de la agenda trazada.

—O—

Voto disidente del Juez Asociado Señor Negrón García.

Este recurso, *ÚNICO* en los anales constitucionales, en conciencia amerita nuestra intervención. Constituye un peligroso precedente que *ALTERA* sustancial e irremediablemente todas las normas de sana administración en materia de desembolsos públicos. Confiere al Gobernador de Puerto Rico, Hon. Rafael Hernández Colón, una *CARTA BLANCA* para que, a su absoluto arbitrio y sin autoridad en ley, pueda ordenar al Banco Gubernamental de Fomento que otorgue contratos de campañas publicitarias contrarias a una política pública *en particular*.

En virtud de la tesis mayoritaria implícita de abstención prudencial, fundada en que estamos frente a una controversia no justiciable perteneciente a la arena política, la figura ejecutiva que emerge "sin limitaciones de ninguna clase", ante y desde este *"TRIBUNAL SUPREMO"*, es la de *"JEFE SUPREMO"* capaz de ejercer la dirección de la administración pública, incluso sobre las Ramas Legislativa y Judicial, visión que fue *RECHAZADA* por la Asamblea Constituyente. 3 Diario de Sesiones de la Convención Constituyente 2274 (1961).[1]

Y todo este inmenso poder, a base del frágil argumento de que el pasado 20 de febrero de 1990, en su mensaje anual al país, el Gobernador, Hon. Rafael Hernández Colón, *anunció su intención de someter* a la Asamblea Legislativa *un proyecto de ley* que autorice la venta de los activos de la Autoridad de Teléfonos. El

---

[1] Un examen del inventario de facultades y deberes reconocidos expresamente al Gobernador en el Art. IV, Sec. 4 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, nos impide refrendar semejante proposición. Al igual que los otros dos (2) poderes —Legislativo y Judicial— no es absoluto. No podemos hablar en abstracto de "poderes inherentes" para expandirlo. La propia Sec. 4, *in fine*, dispone claramente sus contornos: el Gobernador podrá "[e]jercer las *otras facultades y atribuciones* y cumplir los demás deberes que *se le señalen por esta Constitución o por ley*". (Énfasis suplido.) Const. E.L.A., *supra*, ed. 1982, pág. 349. Contra este marco de referencia —Constitución y ley— es que nos corresponde legítimamente descargar nuestra función judicial.

resultado judicial es una novedosa ecuación constitucional cuya equivalencia jurídica es: MENSAJE ANUAL=CAMBIA Y CREA INSTANTÁNEAMENTE NUEVA POLÍTICA PÚBLICA; DEROGA *IPSO FACTO* LEYES VIGENTES; GENERA CONTRATOS DE PUBLICIDAD; ORIGINA Y OBLIGA VÁLIDAMENTE EL DESEMBOLSO DE FONDOS PÚBLICOS.

Confesamos que nos resulta difícil comprender la lógica de esta ecuación y su equivalencia de los elementos constitucionales que intervienen en un fenómeno semejante. Y es "que el ejercicio de la abogacía y las demás actividades de los juristas reclama el constante auxilio de la lógica. Pero como sea que el Derecho, como ineludible exigencia de la convivencia humana, ha de subvenir, humanamente también, a las necesidades sociales para cuya satisfacción se dicta; el insigne autor invocado [Couture], en su citado opúsculo (2º mandamiento), advierte que la Lógica del Derecho no ha de ser meramente 'una lógica formal, sino una lógica viva hecha con todas las sustancias de la experiencia humana'". J.M. Mans Puigarnau, *Lógica para Juristas*, Ed. Bosch, 1978, pág. 7. Acudamos, pues, a esa "'lógica viva hecha con todas las sustancias de la experiencia humana'" y a la acumulada judicialmente.

La tarea exige aclarar brevemente un concepto medular atinente, a saber, la similitud y diferencia básica entre los programas de acción de los partidos políticos frente a una política pública oficial gubernamental. Ambos son de contenido ideológico e incluyen los planes sociales, económicos e idearios políticos. Ahí termina la semejanza. Una vez sometidos al electorado, culminada la elección de los funcionarios y debidamente juramentados, éstos pueden transformar sus programas partidistas en política pública de acción a través de los canales constitucionales que corresponden al Primer Ejecutivo y a la Asamblea Legislativa.

No obstante, advertimos que en nuestro sistema de gobierno, cimentado en la doctrina clásica de frenos y contrapesos, esa conversión e implantación no es prerrogativa de un solo hombre, sino el producto de todo un proceso decisorio de génesis consti-

tucional en que participa el Primer Ejecutivo y los miembros de la Asamblea Legislativa. Cuando, como en el caso de autos, cualquiera de esos dos (2) poderes hace caso omiso o se aparta de los métodos constitucionales, o impermisiblemente se mezcla la acción partidista con la acción gubernamental oficial, surge la confusa equivalencia de PARTIDOCRACIA COMO DEMOCRACIA. La cuestión, aunque de gran complejidad, ha sido objeto de diversos enfoques y teorías. La línea es tenue y difícil de trazar según lo acredita el Prof. Mark G. Yudof en su reputada obra *When Government Speaks*, University of California Press, 1983.

## I

Este Tribunal desaprovecha la oportunidad histórica de reafirmar dos (2) principios elementales. El primero, que en nuestra democracia el concepto dinámico de *política pública*, en su sustrato jurídico-doctrinario, está inexorablemente atado a la Constitución, a las leyes y, en casos apropiados, a los dictámenes judiciales. Y el segundo, que el *requisito constitucional de legalidad* en el desembolso del dinero público —"por autoridad de ley", Art. VI, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 369— forma parte de un diseño fundamental para garantizar el crédito público, tan necesario para la salud y el mejoramiento económico del pueblo.

Si bien la formulación de política pública puede originarla el Primer Ejecutivo, cuando esa iniciativa *DIRECTAMENTE* modifica, altera y es contraria a una política pública *ESPECÍFICA, plasmada previamente* en un estatuto, su validez y oficialidad sólo se configura —y es constitucionalmente posible— con el consentimiento de la Asamblea Legislativa mediante la aprobación de una NUEVA LEY. Véase *Matos v. Siaca, Sec. P.R.*, 21 D.P.R. 420, 429 (1914), a los efectos de que es el Legislativo el poder facultado a fijar la política pública en Puerto Rico. La misma dinámica opera a la inversa. Para que la Legislatura introduzca variaciones a una política pública en *particular*, preestablecida en leyes anteriores, precisa del concurso del Primer Ejecutivo.

Es innegable que el Primer Ejecutivo goza de la facultad de *procurar —no realizar—* cambios en la política pública. Puede encargar la realización de investigaciones y coordinar estudios preliminares de viabilidad y conveniencia para encaminar cambios en la *política pública* existente. También puede cabildear en la Legislatura. Sin embargo, nuestro sistema constitucional le priva de utilizar *fondos públicos* para UNILATERALMENTE implantar, introducir o lograr cambios en o ganarse la opinión pública mediante campañas publicitarias, AJENAS a la requerida interacción gubernamental entre la Rama Ejecutiva y la Rama Legislativa. Ciertamente, estos no son los mecanismos de frenos y contrapesos vislumbrados en nuestro esquema de separación de poderes.

Aunque reconocemos que la sabiduría de determinada política pública, así como su cambio, no se rigen por las opiniones personales de legos, abogados o jueces, no podemos olvidar que vivimos en un régimen de leyes y que " '[l]a verdadera esencia de un gobierno libre consiste en considerar los puestos [y fondos] públicos como un fideicomiso, encomendado para el bien del país y no para beneficio de determinado individuo o partido [político]' ". *Ex rel. Pérez v. Manescau*, 33 D.P.R. 739, 742 (1924). Por ende, cuando esa esencia es seriamente trastocada por una actuación al margen de la Constitución o de las leyes, que atenta contra esa política pública, por excelencia el remedio es judicial.

La expedición del auto por el Tribunal también hubiese demostrado hasta la saciedad que LA POLÍTICA PÚBLICA VIGENTE ES RETENER LOS ACTIVOS DE LA AUTORIDAD DE TELÉFONOS DE PUERTO RICO, según fue declarada en las Leyes Núm. 25 de 6 de mayo de 1974 (27 L.P.R.A. sec. 401 *et seq.*); Núm. 7 de 5 de abril de 1977 (27 L.P.R.A. sec. 403(b)), y Núm. 2 de 8 de junio de 1978 (27 L.P.R.A. sec. 407(v)).

Discrepamos, pues, de la negativa mayoritaria a expedir y revocar la Resolución del Tribunal Superior, Sala de San Juan (Hon. Arnaldo López Rodríguez), de 30 de marzo de 1990. Dicho foro denegó la petición de *injunction* preliminar del representante del Partido Independentista Puertorriqueño, Lcdo. David

Noriega Rodríguez, para paralizar —por contravenir la política pública y ser inconstitucional— la campaña publicitaria, *sufragada con fondos públicos*, para promover la venta de los activos de la referida Autoridad de Teléfonos.

El ilustrado foro tomó conocimiento judicial de que desde el 24 de marzo de 1990 el Banco Gubernamental de Fomento inició una masiva campaña de anuncios para promover la venta de "Facilidades de Comunicación". En términos generales, los anuncios de radio y de prensa versan sobre la fábula de una vaca llamada *FORTUNATA* y los beneficios de la venta por su dueño. Los anuncios de televisión son interpretados por un cantante. Además, los de prensa, específicamente, presentan a una telefonista y aluden a la garantía de permanencia en el empleo una vez consumada la venta.

Expongamos la legislación que encarna la POLÍTICA PÚBLICA VIGENTE en cuanto a la Autoridad de Teléfonos y por qué la campaña publicitaria es ILEGAL.

II

El Art. 3(b) de la Ley Núm. 25, *supra,* 27 L.P.R.A. sec. 403(b) —conocida como Ley de la Autoridad de Teléfonos de Puerto Rico— *estableció y declaró como política pública la adquisición, posesión y operación de un servicio eficiente de comunicaciones* a través de esa entidad gubernamental creada por el mismo estatuto. Ese mandato, refrendado durante el primer cuatrienio en la gobernación del codemandado, Hon. Rafael Hernández Colón, *no fue a perpetuidad.* Sería "HASTA TANTO LA ASAMBLEA LEGISLATIVA DETERMINE, COMO POLÍTICA PÚBLICA, LA CONVENIENCIA DE QUE LAS FACILIDADES DE COMUNICACIÓN EN PUERTO RICO SEAN POSEÍDAS Y OPERADAS POR UNA EMPRESA PRIVADA . . .". (Énfasis suplido.) 27 L.P.R.A. sec. 403(b).

En 1977 juró como Primer Ejecutivo el Hon. Carlos Romero Barceló. Ese mismo año, con su firma, aprobó la Ley Núm. 7, *supra,* enmendatoria de la Ley Núm. 25, *supra,* para *expresa-*

*mente hacer viable y autorizar gestiones relacionadas con la venta de los recursos de esas facilidades de comunicación pertenecientes al Pueblo.* De ese modo autorizó a la *Autoridad de Teléfonos* a *"hacer las gestiones* para la venta, vender y entrar en convenios o contratos, *por recomendación del Gobernador,* para la venta de las Facilidades de Comunicación de la Autoridad, *sujetas dichas gestiones y ventas a la aprobación de la Asamblea Legislativa ".* (Énfasis suplido.) 1977 Leyes de Puerto Rico 18.

Sin embargo, la Asamblea Legislativa no delegó de manera absoluta su facultad. Con ese propósito, enmendó el inciso (b) del Art. 3 antes aludido de la Ley Núm. 25, *supra,* y *reafirmó* como política pública que las facilidades de comunicaciones "sean poseídas y operadas por y a través de la Autoridad de Teléfonos de Puerto Rico, la entidad gubernamental creada por las disposiciones de est[a ley], *hasta tanto la Asamblea Legislativa determine, como política pública, la conveniencia de que las Facilidades de Comunicación en Puerto Rico sean poseídas y operadas por una empresa privada . . .".* (Énfasis suplido.) 27 L.P.R.A. sec. 403(b).

Las gestiones de la venta no tuvieron éxito. En vista de ello, el Poder Legislativo *REITERÓ* la política pública *ORIGINAL Y DESISTIÓ DE VENDERLA.* A tal efecto, en virtud de la *Ley Núm. 2,* supra, se DEROGÓ el inciso (v) antes citado de la Ley Núm. 25, *supra.* En otras palabras, RESCATÓ LOS PODERES PREVIAMENTE DELEGADOS Y *PRIVÓ* AL GOBERNA-DOR, *cualquiera que fuera,* de intervenir y recomendar a la Autoridad de Teléfonos la realización de gestiones para su venta. Por su importancia, transcribimos la Exposición de Motivos de la Ley Núm. 2, *supra:*

> La Ley Núm. 7 de 5 de abril de 1977 enmendó la Ley Núm. 25 de 6 de mayo de 1974, conocida como Ley de la Autoridad de Teléfonos de Puerto Rico, *ampliando su finalidad al determinar que la Asamblea Legislativa sea la que establezca la política pública sobre la conveniencia de que las facilidades de comunicación en Puerto Rico sean poseídas y operadas por una empresa privada.*
>
> Como complemento de esa determinación, se *adicionó el inciso (v) al Artículo 7 de dicha ley confiriéndole a la Autoridad de*

*Teléfonos de Puerto Rico la facultad de realizar gestiones para la venta de las facilidades de comunicación de la Autoridad, por recomendación del Gobernador, sujetas dichas gestiones y ventas a la aprobación de la Asamblea Legislativa.*

En el ejercicio de los poderes conferidos, la Autoridad de Teléfonos llevó a cabo un proyecto de ofrecer en venta a la "Puerto Rico Telephone Company", en una forma profesional, expedita, y basado en sólidos criterios de servicio para los mejores intereses del pueblo de Puerto Rico.

A pesar de los encomiables esfuerzos realizados, la Autoridad no pudo hallar una sola entidad que mostrara interés en iniciar negociaciones preliminares conducentes a la adquisición total e inmediata de la "Puerto Rico Telephone Company", dentro de los criterios básicos establecidos.

EN LAS CIRCUNSTANCIAS ACTUALES Y EN EL FUTURO INMEDIATO PREVISIBLE, RESULTA DE POCO O NINGÚN CONTENIDO PRÁCTICO LA CONTINUACIÓN DE GESTIONES ENCAMINADAS A LA VENTA DE LA "PUERTO RICO TELEPHONE COMPANY".

Hecha esta determinación, es necesario viabilizar que la Autoridad pueda por conducto del Banco Gubernamental de Fomento para Puerto Rico, efectuar una venta de bonos a la mayor brevedad y continuar ofreciendo bonos en el mercado en fechas oportunas en el futuro.

A FIN DE QUE DICHOS BONOS PUEDAN OFRECERSE COMO INSTRUMENTOS EXENTOS DE CONTRIBUCIONES FEDERALES, CON TODA LA BUENA FE QUE CARACTERIZA AL GOBIERNO DE PUERTO RICO ANTE LA COMUNIDAD FINANCIERA, *ES MENESTER CONSIGNAR EN LA LEY, COMO DETERMINACIÓN DE POLÍTICA PÚBLICA, QUE LA "PUERTO RICO TELEPHONE COMPANY" SERÁ RETENIDA POR LA AUTORIDAD DE TELÉFONOS DE PUERTO RICO, HABIÉNDOSE DESISTIDO DE OFRECERLA EN VENTA.* (Énfasis suplido.) 1978 Leyes de Puerto Rico 389–390.

El título de esta ley es sumamente revelador: "Autoridad de Teléfonos— 'Puerto Rico Telephone Co.' RETENCIÓN." (Énfasis suplido.) 1978 Leyes de Puerto Rico 389.

## III

Del historial y de la trayectoria legislativa expuesta surge que ni el Gobernador, Hon. Rafael Hernández Colón, ni la Autoridad

de Teléfonos, como tampoco ninguna otra agencia, tienen actualmente autoridad en ley —mandato legislativo— para realizar campañas publicitarias dirigidas a promover la venta de los activos de la primera *con cargo a los fondos públicos*. Ello es contrario a la política pública vigente. Para ese fin, es imperativo que el Poder Legislativo evalúe la necesidad y conveniencia de cualquier cambio y así lo autorice estatutariamente.

El trámite legislativo seguido en 1977 así lo corrobora. En aquel entonces, como hemos visto, se autorizó expresa y temporeramente, por enmienda a la ley, la realización de tales gestiones de venta con la participación del Gobernador, Hon. Carlos Romero Barceló. Sin embargo, el Poder Legislativo se reservó la última palabra. Sin ambajes consignó que la decisión final de alterar la política pública establecida sería suya. A PARTIR DEL 8 DE JUNIO DE 1978 SE DESISTIÓ Y ELIMINÓ DEL PANORAMA TODA PERSPECTIVA DE VENTA Y SE RETORNÓ A LA POLÍTICA PÚBLICA ORIGINAL DE RETENCIÓN.

## IV

Frente a estos antecedentes no cabe sostener autoridad legal alguna del Gobernador, Hon. Rafael Hernández Colón, ni del Banco Gubernamental de Fomento para desarrollar una campaña publicitaria oficial al efecto. Tiene razón el apelante Noriega Rodríguez al interpretar que es menester la intervención previa de la Asamblea Legislativa para variar el curso de acción propuesto y avalarlo como NUEVA POLÍTICA PÚBLICA.

En 1978 el Banco Gubernamental de Fomento SÓLO recibió autorización legal para procurar, a nombre de la Autoridad de Teléfonos, la emisión de bonos como alternativa para allegarle fondos. *YA LO HIZO*. NO PUEDE AHORA UTILIZAR FONDOS PÚBLICOS PARA LA PROMOCIÓN DE SU VENTA. HACERLO ES UN CONTRASENTIDO Y ATENTA CONTRA LA POLÍTICA PÚBLICA DE RETENCIÓN VIGENTE. Después de todo, dicho banco sólo actúa "como depositario o

fideicomisario de fondos del Estado Libre Asociado de Puerto Rico . . .". 7 L.P.R.A. sec. 552(B).

En resumen, carecen de autoridad legal el Gobernador, Hon. Rafael Hernández Colón, como el Banco Gubernamental de Fomento, demás entidades y funcionarios, para desembolsar y comprometer fondos públicos (en una proyectada venta no autorizada) fuera de los necesarios para realizar los estudios y cabildeo legislativo. Sus actuaciones son *ULTRA VIRES* y contrarias a la legislación y política pública.

## V

Esta conclusión nos obliga a dirigir nuestra atención al voto concurrente del Juez Asociado Señor Hernández Denton. De entrada, es necesario realinear las coordenadas del recurso.

*Primero*: Su ponencia desvirtúa la controversia planteada. La circunscribe a determinar si el Gobernador, Hon. Rafael Hernández Colón, "tiene autoridad para utilizar fondos públicos con el propósito de formular cambios en la política pública y promover la legislación correspondiente, y que la prudencia judicial aconseja que no intervengamos en la controversia sobre la razonabilidad de los gastos o los medios utilizados para lograr esos propósitos . . .". Voto concurrente del Juez Asociado Señor Hernández Denton, pág. 51.

Nadie nunca ha cuestionado la autoridad del Gobernador para "formular cambios en la política pública y promover la legislación correspondiente . . .". Voto concurrente del Juez Asociado Señor Hernández Denton, pág. 59. Tampoco es un problema de "prudencia judicial". Íd. La controversia real es la "procedencia legal" de sus actuaciones dentro del marco constitucional al haber iniciado "una extensa campaña de información pública . . . a través de todos los medios de comunicación" sobre "los méritos de [su] propuesta" (íd., págs. 55−56), contrario a un mandato legislativo. Pecaríamos de ingenuos si no reconociéramos que esa campaña publicitaria fue diseñada con el propósito de contrarrestar la oposición pública generada por "su propuesta" entre algunos legisladores, ciudadanos, obreros, uniones y otras agrupaciones.

*Segundo*: Ante la carencia de autoridad legal, ha tenido que invocar el socorrido poder "inherente" del primer mandatario para informar al pueblo sobre medidas y planes para atender los problemas del país. Voto concurrente del Juez Asociado Señor Hernández Denton, pág. 54. Ciertamente ese poder "inherente" dista mucho de ser fuente de ley para iniciar una campaña publicitaria que contraviene la política pública establecida. Ya hemos visto que el Art. IV, Sec. 4 de nuestra Ley Fundamental, L.P.R.A., Tomo 1, ed. 1982, pág. 349, sólo le autoriza a "[e]jercer las otras facultades y atribuciones y cumplir los demás deberes que se le señalen por ESTA CONSTITUCIÓN O POR LEY". (Énfasis suplido.)

*Tercero*: En este caso *en particular*, nuestra función judicial no es explorar "la razonabilidad de los gastos". Voto concurrente, del Juez Asociado Señor Hernández Denton, págs. 56–57. Ese aspecto no está planteado. Sea uno, cientos, miles o cientos de miles de dólares, nuestra indelegable obligación es determinar su legalidad y constitucionalidad.

*Cuarto*: Sostiene que ello es "ceder a la tentación de intervenir en [esta] controversia . . .". Voto concurrente del Juez Asociado Señor Hernández Denton, pág. 57. Esa tesis sólo es factible bajo la doctrina de abstención judicial. Ello está implícito a lo largo de su concurrencia. La misma es un paso en retroceso y un abrupto cambio que contrasta con el curso decisorio adoptado por este Foro en innumerables ocasiones y ratificado recientemente por voz del propio Juez Asociado Señor Hernández Denton en *Silva v. Hernández Agosto*, 118 D.P.R. 45, 55 (1986):

> En todas las ocasiones anteriores ante reclamos de cuestión política *hemos reafirmado el poder de los tribunales de ser los intérpretes finales de los contornos de la Constitución y para determinar si los actos de una rama de gobierno exceden su autoridad constitucional. Marbury* v. *Madison*, 1 Cranch 137 (1803); *Santa Aponte* v. *Srio. del Senado*, supra. La interpretación inicial que de la Constitución haga otra rama merece deferencia, pero debe prevalecer la norma de que la determinación final corresponde a los tribunales. *United States* v. *Nixon*, supra. *Nuestra estructura de gobierno no permite que las ramas políticas del*

*Gobierno se conviertan en árbitros de sus propios actos.* Véanse: *The Supreme Court, 1968 Term.*, 83 Harv. L. Rev. 62, 68 (1969); H. Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 Harv. L. Rev. 1 (1959); Henkins, *op. cit.*; Redish, *op. cit.*; Tribe, *op. cit.*; Nowak, Rotunda y Young, *op. cit.*; A. Bickel, *The Least Dangerous Branch*, 2da ed., Connecticut, Yale U. Press, 1986, págs. 183–198. (Énfasis suplido.)

*Quinto*: Resulta poco convincente su posición de que sostener la petición del Representante Noriega implicaría que "la Asamblea Legislativa podría efectivamente impedir que un Primer Ejecutivo *de otro partido político* pueda utilizar fondos gubernamentales para *proponer* nuevos programas de gobierno en conflicto con la legislación vigente". (Énfasis suplido.) Voto concurrente del Juez Asociado Señor Hernández Denton, pág. 56. A renglón seguido, expone como fundamento que el "resultado de la acción propuesta sería debilitar peligrosamente el alcance del Poder Ejecutivo, socavando el equilibrio dinámico que debe prevalecer en un sistema de separación de poderes y creando por fíat judicial un sistema parlamentario de gobierno". Íd.

El argumento es erróneo. Una cosa es *"proponer"* nuevos programas de gobierno y, otra, *"implantarlos"* sin autoridad en ley. La diferencia es de fácil captación. Una vez advertida, el tratamiento jurídico para examinar la validez del desembolso en uno u otro caso es distinto forzosamente.

Más aún, su enfoque nos lleva a transitar desde la grave crisis fiscal existente hasta hundirnos en la arena *movediza* partidista. Las consecuencias de su *ratio decidendi* son claras: ante campañas publicitarias del Gobernador para informar sus propuestas, una Asamblea Legislativa hostil, controlada o no por "otro partido político", podrá comenzar también, *con cargo a fondos públicos*, una contracampaña. Bajo la retórica tesis de abstención judicial y de "mordaza" favorecida en su concurrencia (voto concurrente del Juez Asociado Señor Hernández Denton, pág. 56), ¿quién le pondrá freno a esa disputa y saturación de anuncios "públicos"?, ¿quién controlará la sangría presupuestaria?

Esta aterradora visión del futuro, ¿no es más bien típica de una campaña electoral entre partidos de oposición en año

eleccionario? ¿Por qué trasladarla al escenario gubernamental y gravar los fondos públicos al amparo de la cuestionable práctica de "informar" al pueblo?

Recapitulando, este tipo de campaña, impulsada para ganarse a la opinión pública, abre camino a una contienda político-ideológica de mayor envergadura. Con tal de buscar apoyo entre el electorado, el Primer Ejecutivo podrá desatarla y dirigirla directa e intensamente al pueblo y no a sus representantes legislativos electos, aun cuando sea contraria a la política pública vigente. Y, claro está, para contrarrestar ese ataque a la sabiduría y conveniencia de la legislación y política pública existente, la Asamblea Legislativa podrá utilizar a su vez todo fondo público a su alcance para "informar" su postura.(2) Y tras el telón, los fondos públicos van a parar a las "agencias de publicidad [que] cuentan con expertos conocedores de la conducta humana. Ideas, imágenes, detalles visuales y gráficos aparentemente insignificantes pueden esconder solapadamente un mensaje político. Por lo tanto, no podemos abstraernos de los adelantos de la industria de las comunicaciones y del desarrollo de complejas técnicas para encubrir mensajes". *P.N.P. v. Hernández, Srio. D.T.O.P.*, 122 D.P.R. 362, 388–389 (1988), opinión concurrente.

No podemos refrendar un esquema gubernativo que autoriza desembolsos desmedidos, arbitrarios y contrarios a la legislación aprobada. Menos, que "[e]n última instancia, será el Pueblo de Puerto Rico y *no el Poder Judicial* quien tomará la decisión final sobre su programa de gobierno". (Énfasis en el original.) Voto concurrente del Juez Asociado Señor Hernández Denton, pág. 57.

---

(2)  El impacto nocivo de su posición puede apreciarse con mayor claridad cuando recurrimos a un ejemplo dramático. De acuerdo con sus fundamentos, sería perfectamente válido el absurdo de que el Primer Ejecutivo o la Legislatura, cada cual por separado y sin utilizar los cauces de nuestra Constitución, desarrollaran campañas publicitarias a favor de legalizar el uso de las drogas narcóticas, mientras se mantiene inalterada la ley que informa la política pública en contrario y que condena y desalienta su uso.

Creemos que nadie, absolutamente nadie, por el sólo hecho de un Gobernador anunciar esa propuesta en su mensaje anual o proponerlo a la Legislatura en otro momento, consideraría lícito, según el estado de derecho vigente, la propagación de anuncios sobre los beneficios de esa medida, estimulando la siembra de marihuana, ilustrando el procesamiento y consumo de cocaína y los métodos más higiénicos y efectivos de inyectarse heroína.

Por definición, necesidad y en aras de lograr una administración pública coordinada y eficiente, nuestra estructura gubernamental es de delegación de poderes mediante la *elección* directa de los gobernantes.

## VI

El deseo del Primer Ejecutivo, Hon. Rafael Hernández Colón, de vender la Autoridad de Teléfonos —anunciado en su reciente Mensaje a la Asamblea Legislativa— no es suficiente ni valida esas gestiones. Mucho menos la campaña publicitaria. Por buenas y legítimas que sean sus intenciones, su deber principal es "[c]umplir y hacer cumplir las leyes". Art. IV, Sec. 4, Const. E.L.A., *supra*, pág. 349. HASTA TANTO NO SE MODIFIQUEN ESAS LEYES Y LA POLÍTICA PÚBLICA QUE ENCARNAN, NO PUEDE ALTERARLA POR SU EXCLUSIVA VOLUN- TAD.

¿DESDE CUÁNDO EN NUESTRO ESQUEMA DE GO- BIERNO EL MENSAJE EJECUTIVO ANUAL ES FUENTE DE LEY? ¿CÓMO PUEDE ARGUMENTARSE QUE SU MEN- SAJE ANUAL SOBRE LA SITUACIÓN DEL PAÍS, IN- FORME DE LAS CONDICIONES FISCALES ("[CON] LOS DATOS NECESARIOS PARA LA FORMULACIÓN DE UN PROGRAMA DE LEGISLACIÓN", Art. IV, Sec. 4, Const. E.L.A., *supra*, pág. 349) Y LOS "DESEMBOLSOS *PROPUES- TOS* PARA EL AÑO ECONÓMICO *SIGUIENTE*" —(énfasis suplido) íd.— GENERA *AUTORIDAD EN LEY* PARA LA CAMPAÑA PUBLICITARIA QUE NOS OCUPA? ¿DESDE CUÁNDO LAS CONFERENCIAS Y DECISIONES ADOPTA- DAS POR EL GOBERNADOR Y LA MAYORÍA LEGISLA- TIVA FUERA DEL HEMICICLO —SIN SEGUIRSE LOS CAUCES CONSTITUCIONALES— ENMIENDAN O DERO- GAN LAS LEYES? ¿CÓMO PUEDE EL PROCURADOR GE- NERAL DE PUERTO RICO SOSTENER IGUAL CONCLU- SIÓN A BASE DE LA *MERA PRESENTACIÓN* "ANTE LA ASAMBLEA LEGISLATIVA [D]EL CORRESPONDIENTE

*PROYECTO* DE LEY PARA LA VENTA DE LA TELEFÓNICA Y EL TRÁMITE LEGISLATIVO, DESPUÉS DE LAS VISTAS PÚBLICAS DE RIGOR . . ."? (Énfasis suplido.) Moción de desestimación y oposición, pág. 7.

SI LA VENTA DE LA TELEFÓNICA FUERA LA POLÍTICA PÚBLICA LEGALMENTE ESTABLECIDA, ¿POR QUÉ RAZÓN HAY QUE PROMOVERLA ANTE EL PAÍS? ¿A QUIÉN HAY QUE CONVENCER? EN NUESTRO SISTEMA DE GOBIERNO LA ASAMBLEA LEGISLATIVA, COMO REPRESENTANTE DE LOS CIUDADANOS, ES LA LLAMADA A CUAJAR Y A APROBAR *MEDIANTE LEGISLACIÓN* LA NUEVA POLÍTICA PÚBLICA EN TORNO A LA AUTORIDAD DE TELÉFONOS. REPETIMOS, AL PRESENTE NO SE HA VARIADO LA LEGISLACIÓN QUE *ORDENA RETENERLA*.

"Sin necesidad de entrar en disquisiciones filosóficas en torno a la fuente del poder legislativo, basta con señalar que hemos trascendido las antiguas teorías que señalaban el poder de gobernar como uno que provenía directamente de la divinidad. Por el contrario, hoy reconocemos que el poder legislativo último radica en el propio pueblo, guardando este concepto alguna semejanza a la teoría del contrato social que preconizaba Rousseau." R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico,* 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. 1, pág. 7.

## VII

FRENTE A ESTA INNEGABLE REALIDAD, EL USO DE FONDOS PÚBLICOS ES INCONSTITUCIONAL. Art. VI, Sec. 9, Const. E.L.A., *supra*. No existe autoridad en ley para el inicio de una campaña publicitaria de este género contraria a esa política pública. Al no reconocerlo, este Tribunal *ha claudicado* su responsabilidad judicial de evaluar no la sabiduría por preferencias personales de estos desembolsos de fondos públicos, sino su juridicidad. *Marrero v. Mun. de Morovis,* 115 D.P.R. 643, 645

(1984); *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988). A fin de cuentas, se llaman "fondos públicos" porque provienen de todos los contribuyentes del país y del más amplio *spectrum* político. NO SON PRIVATIVOS DE QUIENES POLÍTICAMENTE OSTENTAN LAS RIENDAS DEL PAÍS DURANTE DETERMINADO CUATRIENIO.

Como expresáramos en nuestra concurrencia en *P.S.P. v. E.L.A.*, 107 D.P.R. 590, 614 (1978):

> De inmediato advertimos los requisitos que deben concurrir al pasarse juicio sobre la legitimidad de una asignación legislativa de "fondos públicos", a saber: contemple un beneficio público (promover el bienestar e interés público de la comunidad); estén destinados a una actividad de carácter público o semipúblico (en contrastes con una privada); su destinatario esté sujeto a intervención gubernamental; y sean asignados por ley.

## VIII

En su verdadera dimensión, la SENSIBLE situación de autos va más allá del dispendio ilegal de fondos públicos. Se proyecta crudamente como una usurpación por parte del Poder Ejecutivo de las funciones del Poder Legislativo. Ello allana el camino y la capacidad procesal de Noriega Rodríguez para instar esta acción. En varias ocasiones hemos reconocido el derecho individual que asiste a los legisladores y a otros funcionarios públicos de comparecer a los tribunales para reivindicar las facultades y prerrogativas de su cargo. Véanse: *Silva v. Hernández Agosto*, supra; *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 415–416 (1982). Compárese *Noriega v. Gobernador*, 122 D.P.R. 650 (1988).

Recuérdese que, distinto a la Constitución federal, la nuestra RECONOCIÓ Y GARANTIZÓ expresamente, como medio de fiscalización, a las minorías legislativas. "A tal fin, es básico para la *salud democrática* que las minorías tengan una representación que, *aun bajo las circunstancias más desfavorables*, les permita cumplir adecuadamente su función de fiscalizar y estimular a la mayoría en su obra de gobierno sin crear entorpecimientos que

puedan resultar en detrimento de la democracia." (Énfasis suplido.) Diario de Sesiones, *supra*, Vol. 4, pág. 2590. Cuando por razones partidistas la mayoría no actúa en defensa de las prerrogativas del cuerpo, ¿cómo negarle a un legislador minoritario acudir a los tribunales en reivindicación del mismo? Si éste no puede hacerlo, ¿quién entonces podrá "cumplir adecuadamente [la] función de fiscalizar" a la mayoría? Íd. En tales circunstancias, no concebimos que las puertas de los tribunales puedan cerrársele. Claro está que para que prevalezca tiene que demostrar la procedencia de su causa de acción, esto es, la inconstitucionalidad e ilegalidad del acto ejecutivo impugnado y su nexo racional. Aun bajo la experiencia norteamericana, "procede reconocerle a un legislador legitimación activa (*standing*) cuando demuestra que la actuación impugnada tiene el efecto de anular su voto, pasado o futuro, o cuando están en juego otros aspectos fundamentales de sus prerrogativas legislativas". (Traducción nuestra.) L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 153.

Para la consideración de cuestiones de vasto interés público, la "tendencia actual es decididamente hacia la liberalización y simplificación de las normas que rigen esta zona del Derecho" (*E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 398 (1983)) y hay que sopesar a "plena luz, a las fuerzas subyacentes que motivan en la realidad la abstención o intervención judicial en una situación dada". Íd., pág. 399. Véase, también, *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974).

Las actuaciones del Primer Ejecutivo, Hon. Rafael Hernández Colón, del Banco Gubernamental de Fomento y de las otras entidades y funcionarios no se ajustan al mandato de ley *prevaleciente*. No son compatibles ni están en sintonía con nuestro esquema constitucional de separación de poderes. La campaña gubernamental para justificar la *propuesta* venta de la Telefónica, con el consabido desembolso de miles de dólares del erario, choca con la legislación y la política pública específicamente establecida. HASTA TANTO LA ASAMBLEA LEGISLATIVA ACTÚE, PODRÁN CONTINUARLA, PERO NO ES LEGAL. "No toda

forma de expresión gubernamental es permisible, no obstante, las instancias más problemáticas de expresión gubernamental, usualmente son las más sutiles e incidiosas." (Traducción nuestra.) Tribe, *op. cit.*, págs. 809–810.

Demostrado el reclamo de ilegalidad e inconstitucionalidad, es evidente que están presentes todos los requisitos de la Regla 57.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, necesarios para la expedición del *injunction*, a saber, una lesión a las prerrogativas del cargo de representante de Noriega Rodríguez, los anuncios son de carácter diario, repetitivo, continuo y recurrente, e implican el desembolso no autorizado de fondos públicos, todo de forma irreparable. Se impone con urgencia un remedio judicial para ponerle fin inmediatamente. *Peña v. Federación de Esgrima de P.R.*, 108 D.P.R. 147, 154 (1978).

Conjurar la presente situación es materia judicial prioritaria. Como expusiéramos en nuestro disenso en *Berberena v. Echegoyen*, 123 D.P.R. 76 (1988) —al sostener la inconstitucionalidad de la Ley Núm. 25 de 3 de junio de 1960 (18 L.P.R.A. sec. 249d), que otorga licencias políticas a maestros candidatos a puestos electorales Y GRAVA ANUALMENTE EN MÁS DE VEINTE MILLONES DE DÓLARES ($20,000,000) EL PRESUPUESTO DEL DEPARTAMENTO DE EDUCACIÓN— "[c]obran vigencia nuevamente las palabras siguientes: 'En momentos en que en el país se debate públicamente la crisis y el estado de deterioro físico y académico de las instituciones educativas, y la escasez de medios económicos para afrontar tales problemas y mejorar los sueldos del magisterio, resulta una falta de civilidad la vigencia de la [Ley Núm. 25 de 3 de junio de 1960, *supra*,] que nos ocupa.' *Pacheco v. Srio. Instrucción Pública*, 108 D.P.R. 592, 603 esc. 3 (1979) . . .".

SIN MENOSCABAR LA IMPORTANCIA DE ESTE RECURSO JUDICIAL, CON RESPETO A TODOS LOS CONCERNIDOS Y POR VÍA DE ANALOGÍA, AL DECIR DE UNA PEGAJOSA Y RÍTMICA CANCIÓN DE HACE DÉCADAS, LA ALEGÓRICA *FORTUNATA* —POR SER ACTUALMENTE DE DOMINIO PÚBLICO— AUNQUE ES "UNA

VACA LECHERA, NO ES UNA VACA CUALQUIERA, TOLÓN . . . TOLÓN". PUERTO RICO NO ES UNA FINCA PRIVADA.

Por los fundamentos expuestos, disentimos. En abono del interés público VULNERADO, procedía el *injunction*, la prohibición de esta campaña publicitaria ilegal y la remisión del asunto al Secretario de Justicia para el inicio de las acciones conducentes a decretar la nulidad de los contratos de publicidad otorgados por el Banco Gubernamental de Fomento y, simultáneamente, recobrar cualesquiera desembolsos habidos.